[Crim. No. 23647. July 25, 1985.]

In re MICHAEL L., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL L., Defendant and Appellant.

COUNSEL

Harold M. Jaffe, under appointment by the Supreme Court, for Defendant and Appellant.

Frank O. Bell, Jr., State Public Defender, Ralph Goldsen and Michael Pescetta, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gloria F. DeHart and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

Michael E. Nail, District Attorney (Solano) and John R. Vance, Jr., Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**THE COURT.**—Michael L., a minor, appeals from an order adjudging him to be a ward of the state under section 602 of the Welfare and Institutions Code and committing him to the California Youth Authority upon a finding that he had perpetrated a robbery. We must decide whether testimony identifying appellant as the perpetrator of the robbery in question should have been excluded at trial because police failed to seize from a private party the now erased videotape that enabled the witnesses to make their identifications. We conclude that the testimony was admissible.

### BACKGROUND

Eduardo Gonzalez was robbed by two individuals on the evening of February 13, 1982, while he was working behind the counter at McGoo's Donut Factory on 82d Street in Oakland. While one of the robbers occupied himself at a cigarette machine, the other approached Gonzalez on the pretense of wanting change for a $10 bill. He pulled a knife, leaped over the counter and demanded that Gonzalez open the cash register, warning, "If you make a false move you're gone." Gonzalez complied. The second robber then jumped over the counter and took all the currency, and the armed robber took all the coins.

After the robbers fled, Gonzalez reported the incident to Oakland police, and an officer responded within the hour. Gonzalez had never before seen the robbers but was able to describe their clothing. He reported to the officer that the armed individual—a black male aged 16 or 17, of medium build

and about 5 feet 6 or 7 inches in height—wore a V-pattern light and dark blue ski jacket, black surfers (tennis shoes), a hooded sweatshirt with the hood up, a brimmed baseball cap, and blue jeans.

The robbery was recorded on videotape by an automatic store surveillance camera. Susan Thomas, who with her husband LeRoy owned the store, viewed the videotape in a back room of the store several times on the night of the robbery, first alone and then in the company of Gonzalez, a neighborhood boy, and the responding officer. Although she did not witness the robbery itself, from the tape Susan Thomas recognized the youth with the knife as a "neighborhood kid" and the brother of another youth, Victor. She so informed the officer. The neighborhood boy also recognized the youth with the knife and volunteered that his name was Michael. Before departing from the store the responding officer asked Susan Thomas to preserve the tape for later viewing by investigating officers. Susan Thomas never again spoke with police about the tape.

As part of the robbery investigation, Sergeant Samuel Maddux of the Oakland police and another sergeant went to the store on February 16 and viewed the videotape in the presence of LeRoy Thomas. Using a freeze-frame device on the Thomases' videotape player, Sergeant Maddux selected certain frames and photographed them with Polaroid and 35 millimeter cameras.

Sergeant Maddux interviewed Eduardo Gonzalez on the next day, February 17. Gonzalez, who had viewed the videotape on the night of the robbery four days earlier, was shown a lineup consisting of six photographs and quickly selected one of appellant (taken in Dec. 1979) from among them. He said, "That looks like the guy." When pressed by the sergeant, Gonzalez said he could not be certain, but he did find a strong resemblance. Gonzalez gave a signed statement to that effect.

At some point prior to the first hearing in the case, the Thomases inadvertently erased the videotape of the robbery. The tape had been left in their possession. Sergeant Maddux testified that when he took the freeze-frame photographs he had wanted to take the tape into police custody, but that LeRoy Thomas had objected because in the past the courts had held his property "too long." Maddux further testified that he did ask LeRoy Thomas to save the tape and that Thomas had indicated he would do so. LeRoy Thomas testified that the tape was erased inadvertently. He also stated that the officers might have asked him to save the tape but that he could not recall whether they in fact did. Susan Thomas, who acknowledged that she had been instructed to preserve the tape, testified that she thought there was no need to save the tape once the investigating officers had examined it.

Two freeze-frame photographs of the videotape were admitted into evidence at trial. Sergeant Maddux, Eduardo Gonzalez, and Susan Thomas all identified the photographs as representations of the lost videotape but none could identify appellant from the photographs, which the witnesses variously characterized as "blurry," "fuzzy," and "not very good."

Gonzalez, who had described the armed robber as wearing the hood of a hooded sweatshirt up over his head, could not tell whether the robber was shown in the photographs or whether anyone depicted in them wore a hood, although he noted that one person was wearing something on his head. Although she testified that "the tape was very clear" and was able to identify appellant in court as the robber depicted in the tape, Susan Thomas stated that she could not make an identification based on the freeze-frame photographs. Gonzalez, when asked in court to think back to the night of the robbery and to put out of his mind the photographic lineup identification about which he had also testified, said in reference to appellant, "I'm not so sure but I think it's him."

Execution of a warrant search of appellant's residence turned up a two-tone blue jacket similar to the one worn by the robber who carried the knife. The search also produced a photograph of appellant wearing that jacket, and Sergeant Maddux testified that he recognized that jacket from the videotape he had viewed following the robbery. Gonzalez also identified photographs of the blue jacket seized from appellant's home, saying, "Well, the guy with the knife was wearing something like this." He did not recall the V-shape pattern on the sleeves (shown in the photographs) but explained that he had only looked at the body of the jacket during the robbery. Gonzalez recognized in one of the freeze-frame photographs a jacket that looked like the one in police photographs of the seized jacket.

Counsel for appellant objected on *Hitch* grounds (*People* v. *Hitch* (1977) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]) to the admission of evidence concerning the videotape viewings as well as evidence which might have been derived from them, including all in-court identifications of appellant. The objections were overruled.

The court found that appellant had perpetrated the robbery and committed him to the custody of the Youth Authority for five years. The court added a year to the commitment on the ground that appellant had used a deadly weapon. (Pen. Code, § 12022, subd. (b).)

## DISCUSSION

### I. *Exclusion of the In-court Identifications*

Initially, we observe that the rule announced in *People* v. *Hitch, supra,* 12 Cal.3d 641, is not necessarily applicable to the present case. In *Hitch,*

we held that the federal guaranty of due process requires the People to *preserve* breathalyzer ampoules in their possession for later retesting by defendants charged with driving while intoxicated. We ruled that the People's duty to preserve applies whenever there exists a "reasonable possibility" that the evidence would have constituted "favorable evidence on the issue of guilt or innocence." (*Id.*, at p. 649.) We later applied *Hitch* to require the preservation of a semen sample taken from a rape victim (*People v. Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051]), and a urine sample taken from a suspected narcotics user (*People v. Moore* (1983) 34 Cal.3d 215 [193 Cal.Rptr. 404, 666 P.2d 419]).

In *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], the United States Supreme Court addressed for the first time the People's duty under the due process clause of the Fourteenth Amendment to take affirmative steps to preserve evidence. Although the high court acknowledged our effort in *Hitch* to define the duty imposed by the federal Constitution (see *id.*, at p. 484, fn. 5 [81 L.Ed.2d at p. 419, 104 S.Ct. at p. 2531]), it formulated its own test describing the contours of the obligation: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.*, at pp. 488-489, fn. omitted [81 L.Ed.2d at p. 422, 104 S.Ct. at p. 2534].)

It is apparent that the *Trombetta* formulation of the duty-to-preserve test differs substantially from our own *Hitch* standard. It is unnecessary, however, for us to reach the question whether *Hitch* has "survived" *Trombetta*, for we have concluded that, under the circumstances in this case, exclusion of the identification testimony is unwarranted even under our pre-*Trombetta* authority.

In overruling appellant's objections, the trial court observed that the decisional law has not imposed a duty on police officers to seize evidence from private persons on a defendant's behalf. In *People v. Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93], we stated that police "cannot be expected to 'gather up everything which might eventually prove useful to the defense.' " (*Id.*, at p. 851.) We then added that "[t]here might be cases in which this court would impose sanctions for a failure to obtain evidence." (*Ibid.*)

The pros and cons involved in determining whether to impose on police a duty to seize material evidence are aptly set forth in the concurring opinion

of Justice Lucas and the dissenting opinion of Chief Justice Bird. Suffice it to note that the issue is a complex and provocative one on which reasonable minds might disagree.    For a number of reasons, however, we conclude that on the facts of this case the failure of the police officers to seize the tape recording does not warrant the exclusion of the identification testimony which defendant seeks to impose as the sanction for the nonseizure.

First, although the officers may have been negligent in failing to obtain the tape, the record demonstrates that the officers did not act in bad faith or with any intent to deprive defendant of this evidence. The record discloses that the police officers investigating the robbery asked the Thomases to release the tape to their custody. When the Thomases refused, the officers directed them not to erase the tape, and the Thomases agreed. Under these circumstances, the officers clearly anticipated that the tape would be preserved and available at the trial. Further, the officers took 35 millimeter photographs of the best stills on the videotape, further indicating reasonable efforts to preserve the evidence for use at the trial.

Second, exclusion of the identification testimony would impose a sanction totally out of proportion to the alleged police failing. (See *People* v. *Zamora* (1980) 28 Cal.3d 88, 99-103 [167 Cal.Rptr. 573, 615 P.2d 1361].) Here, the reliability of the witnesses' identification is evidenced by the fact that—on viewing the videotape—both Mrs. Thomas and a neighborhood boy immediately identified defendant, whom they knew previously, as the armed robber. Additional witnesses—Gonzalez and the initial investigating police officer—confirmed that the videotape was clear and was run a number of times. Although the videotape machine and other tapes recorded on the machine were presumably available for subpoena and inspection, defendant presented no evidence to suggest that the quality of the tape was such as to cast doubt on the accuracy of the witnesses' identification. Under these circumstances, exclusion of the critical identification testimony is unwarranted.

II. *Other Contentions*

Appellant's brief raises two additional issues.

A. *Constitutionality of the Photographic Lineup*

Citing *People* v. *Beivelman* (1968) 70 Cal.2d 60, 78 [73 Cal.Rptr. 521, 447 P.2d 913], appellant contends that the photographic lineup presented to Eduardo Gonzalez was impermissibly suggestive. Appellant asserts that his photograph in the lineup showed him wearing a sweater similar to the one the armed robber wore. The point was not raised in the trial court. Appellant

objected to the lineup identification only on the ground that it was somehow contaminated by Gonzalez' viewing of the lost videotape. ■ Objections not presented to the trial court cannot be raised for the first time on appeal. (Evid. Code, § 353; *People* v. *Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) Accordingly, we will not examine the issue.

### B. *Impermissible Enhancement*

■ Appellant asserts that his use of a knife was an element of the crime of robbery, which requires the use of "force or fear" (Pen. Code, § 211), and thus cannot serve as the basis for enhancement under Penal Code section 12022, subdivision (b) (personal use of dangerous or deadly weapon in commission of felony). There is no merit to appellant's contention. The particular means by which force is employed or fear imparted is not an element of robbery. (*People* v. *Cortez* (1980) 103 Cal.App.3d 491, 496 [163 Cal.Rptr. 1].)

The judgment is affirmed.

**LUCAS, J.**—I concur in the judgment. In my view, the officers clearly had no duty to seize a videotape owned by the robbery victims.

As a general rule, " 'the law does not impose upon law enforcement agencies the requirement that they take the initiative, or even any affirmative action, in procuring the evidence deemed necessary to the defense of an accused' (*In re Koehne* (1960) 54 Cal.2d 757, 759 . . . .)" (*People* v. *Newsome* (1980) 136 Cal.App.3d 992, 1006 [186 Cal.Rptr. 676].) Predictably then, the parties have cited no California cases, and my research has disclosed none, that impose on police a duty to seize evidence in the possession of third persons.[1] Indeed, prior cases indicate that the *Hitch* duty to preserve

---

[1]See Comment, *The Prosecution's Duty to Preserve Evidence Before Trial* (1984) 72 Cal. L.Rev. 1019, 1027-1028, 1038-1041. The author argues that the police should have a duty to "preserve" evidence found at the crime scene that could "reasonably be expected to be relevant to the case." (*Id.,* at p. 1027.) If the police fail to preserve the evidence, the court should presume as correct the defendant's version of the lost evidence unless the prosecution can demonstrate, through credible witnesses for example, that defendant's view is unwarranted.

The cases from other states cited by the dissent herein are inapposite. Most of them involve only the duty to preserve, not the duty to seize, and many are based on dubious, pre-*Trombetta* interpretations of the federal Constitution. Moreover, in none of those cases was reliable secondary evidence of guilt available.

The dissent's analogy to the informant cases is imperfect, for in those cases the officers' obligation was clearly limited to making reasonable efforts to learn the whereabouts of a material witness/informer. (E.g., *Twiggs* v. *Superior Court* (1983) 34 Cal.3d 360, 365 [194 Cal.Rptr. 152, 667 P.2d 1165].) The dissent would extend this limited obligation to encompass *all* material evidence, an unlimited extension which might well interfere substantially with the evidence-gathering procedures and responsibilities of the investigating officers.

evidence encompasses no "initial duty to gather or collect or seize potential evidence for defendant's use which investigative officers discover at the scene of a crime." (*People* v. *Bradley* (1984) 159 Cal.App.3d 399, 405 [205 Cal.Rptr. 485]; see also *People* v. *Cooper* (1979) 95 Cal.App.3d 844, 850 [157 Cal.Rptr. 348] [police have no affirmative duty to employ specific investigative techniques such as the lifting of latent fingerprints]; *People* v. *Watson* (1977) 75 Cal.App.3d 384, 400 [142 Cal.Rptr. 134] ["The prosecution is not required to engage in foresight and gather up everything which might eventually prove useful to the defense," and therefore there was no duty to examine soil particles in defendant's trousers].)

To place on police a burden to seize all potentially "useful" or "material" evidence when investigating a crime would create a duty that is, as a practical matter, undischargeable. Unless the scene of every crime is to be preserved in a time capsule pending the final resolution of the question of guilt, decisions must be made to exclude certain evidence from collection.[2] In deciding whether or not to gather evidence, investigating officers should be able to rely on their own good faith judgment, rather than having to view the crime scene with an eye toward seizing all evidence which might be useful to the defendant.

Thus, I conclude that, as a general rule, investigating officers owe the defendant no duty to seize potentially "material" evidence in the possession or control of third persons. Exceptions to this rule may arise in future cases where, for example, the investigating officers intentionally or in bad faith decline to seize material, potentially exculpatory evidence, realizing the likelihood that the evidence will be lost or destroyed. But, as the majority explains, under the circumstances of the present case, no such exception should be created.[3]

---

[2]See Comment, *supra*, 72 Cal. L.Rev. at page 1027: "[A] requirement that the government preserve all conceivable evidentiary objects at the earliest stages of investigation would in effect require the government to impound the entire crime scene. Such a solution is impractical and excessively costly."

[3]The dissent's suggestion that an exclusionary rule should be applied whenever the officers fail to seize material evidence is far too strict. (Indeed, such an exclusionary rule could not be imposed in any case to which Proposition 8 applied. See Cal. Const., art. I, § 28, subd. (d); *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].) Even were we to hold that a duty to seize existed and was breached in this case, the suppression of all secondary identification evidence would not be warranted.

Courts generally order evidence suppressed for two reasons: to ensure a fair trial, and to deter future police misconduct. (See *People* v. *Zamora* (1980) 28 Cal.3d 88, 99-100 [167 Cal.Rptr. 573, 615 P.2d 1361].) Neither reason applies here. The witness' descriptions of the videotape evidence were reliable, and the possibility that the tape contained exculpatory evidence was remote. Defendant had the opportunity to inspect the videotape machine and to cross-examine or impeach these witnesses. Thus, admission of their testimony did not deny defendant a fair trial.

Moreover, as I previously explained, there was no evidence of police misconduct here.

**BIRD, C. J.**—Over 10 years ago, this court held that the government has a duty to preserve evidence material to the accused's guilt or innocence. (*People* v. *Hitch* (1974) 12 Cal.3d 641, 652 [117 Cal.Rptr. 9, 527 P.2d 361].) Today, the majority decline to protect the integrity of that truth-finding process by failing to recognize a duty to *seize* such evidence.

## I.

The question presented by this case is whether the police's failure to seize material evidence relieves them from their duty to preserve such evidence.

When a crime is first investigated, it is the police who are usually first to arrive at the scene. In most cases, no suspect has yet been charged with a crime and there exists no advocate for the defense. Thus, the task of gathering evidence is solely in the hands of the police.

The power to determine what is seized and preserved and what is not must not go unchecked. As Judge Skelly Wright has written, "controlled by rules of law protecting adversary rights and procedures at some stages, the process at other stages is thoroughly unstructured. Beside the carefully safeguarded fairness of the courtroom is a dark no-man's-land of unreviewed bureaucratic and discretionary decision making. Too often, what the process purports to secure in its formal stages can be subverted or diluted in its more informal stages." (*United States* v. *Bryant* (D.C. Cir. 1971) 439 F.2d 642, 644.) A limited duty to seize would minimize this danger.

Imposing an affirmative duty on the police to secure certain information is not a novel notion. In the closely analogous informant-disclosure decisions, this court has held that the police "must undertake reasonable efforts to obtain information by which the defense may locate . . . an informer" when he or she is a material witness on the issue of guilt. (*People* v. *Goliday* (1973) 8 Cal.3d 771, 782 [106 Cal.Rptr. 113, 505 P.2d 537]; accord *Twiggs* v. *Superior Court* (1983) 34 Cal.3d 360, 365 [194 Cal.Rptr. 152, 667 P.2d 1165].) As part of that duty, "the police should make such inquiries and arrangements as are reasonably necessary to enable the prosecution and defense to locate him." (*Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847, 852 [83 Cal.Rptr. 586, 464 P.2d 42]; accord *Twiggs, supra,* 34 Cal.3d at pp. 366-368.)

Such a requirement is but a recognition of "the futility of a rule requiring disclosure of the information which the police know about a material witness

---

The officers neither desired nor caused the tape's erasure. Indeed, the officers undoubtedly have already suffered from the inadvertent erasure: their case against defendant was considerably weakened, and they presumably were reprimanded by their superiors. No further sanction was necessary to deter or prevent future similar occurrences.

informer without a further requirement that the police make efforts to obtain information useful in locating the informer as well." (*Goliday, supra,* 8 Cal.3d at p. 778; accord *Twiggs, supra,* 34 Cal.3d at p. 367.)

In setting down these guidelines, this court recognized that (1) the police will be aware of the materiality of an informant long before the accused, and (2) the prosecution will have greater investigatory resources at its disposal. "The police will know whether the informer was a material witness before charges have been filed against the defendant; it is at this time that inquiries will probably be most fruitful. If investigation is necessary at a later date it is still better undertaken by the prosecution both because of its greater investigatory resources and its superior knowledge of, and contacts with, the informer." (*Eleazer, supra,* 1 Cal.3d at p. 854, fn. omitted; *Twiggs, supra,* 34 Cal.3d at pp. 365-366.)

Identical reasoning supports the proposition that the police should be required to seize material evidence. Just as the police's awareness that an informant is a material witness requires reasonable efforts to maintain contact with him or her, so should their awareness that a certain piece of evidence is material require reasonable efforts to seize it.

The parallels between the two situations are striking. In both, only the police are present to make a materiality determination. In both, an imbalance of resources heavily in favor of the state exists at the investigatory stage.[1] And in both, a duty to secure evidence for the accused furthers the right to a fair trial by affording the defense an opportunity to examine the material evidence.

Thus, when the police are aware of the materiality of an informant, they must take steps to ensure contact with him. Similarly, when the police are aware of the materiality of a piece of evidence, they must seize it to ensure contact with it.

## II.

A limited duty to seize is a logical extension of the *Hitch* duty to preserve. In *Hitch,* this court held that an investigative agency has a duty to preserve

---

[1] "The greater investigative power and advantage of the government over the defense in a criminal case has been acknowledged by various commentators. For example, 'At the outset of a criminal case, the advantage lies with the state because of its ability to gain access to the facts. Generally, the prosecution has both a greater opportunity, including the prompt on-the-scene investigations, and more formidable resources with which to gather and preserve evidence. . . .' (Van Kessel, *Prosecutorial Discovery and the Privilege Against Self-Incrimination: Accommodation or Capitulation* (1977) 4 Hastings Const. L.Q. 855, 871-872.)" (*In re Misener* (1985) 38 Cal.3d 543, 552, fn. 3 [213 Cal.Rptr. 569, 698 P.2d 637].)

and disclose evidence which is material to an accused's guilt or innocence. (12 Cal.3d at p. 652.) This duty arises even in the absence of a request from the defense. (*Id.*, at p. 650.)

The starting point of the *Hitch* analysis was the well-settled rule that the intentional suppression of material evidence favorable to a defendant violates due process, regardless of the good or bad faith of the prosecution. (*Hitch, supra,* 12 Cal.3d at pp. 645-647, citing *Giglio* v. *United States* (1971) 405 U.S. 150, 153-154 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]; *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234] and cases cited therein.) This rule was based on cases involving the nondisclosure rather than the destruction of material evidence. Therefore, in *Hitch,* this court faced the question of whether relief should be afforded an accused when "the evidence subject to disclosure is no longer in existence and the court is therefore unable to ascertain whether such evidence was, or would have been, favorable to the defendant and material on the issue of his guilt or innocence." (*Hitch, supra,* 12 Cal.3d at p. 648.) Answering that question in the affirmative, *Hitch* concluded that the accused need only show that there is a "reasonable possibility" that the evidence would have constituted "favorable evidence on the issue of guilt or innocence." (*Id.*, at pp. 649-650.)

*Hitch* stressed that even in the absence of a discovery request, " 'the duty of disclosure is operative as a duty of preservation.' " (12 Cal.3d at p. 650, quoting *United States* v. *Bryant, supra,* 439 F.2d at p. 651, italic omitted).[2] " 'Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence.' " (*Ibid.*)

The duty to preserve material evidence ensures that the right to examine it will not be frustrated. A limited duty to seize is a logical extension of that duty. Any other rule encourages the prosecution to breach the duty to preserve by failing to seize vital evidence "before prosecution begins or before defendants hear of its existence" (*United States* v. *Bryant, supra,* 439 F.2d at p. 651).

Furthermore, the salutary purposes of the *Hitch* duty-to-preserve rule also apply in the duty-to-seize context. Those purposes were concisely expressed in *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d

---

[2]The court in *Bryant* noted that "[t]he purpose of the duty is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather, it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government." (439 F.2d at p. 648.)

1051], which applied *Hitch* to require the government to preserve a semen sample taken from a rape victim. "Such a rule protects not only the due process rights of the defendant, but also society's interest in the integrity of the judicial system. The duty to preserve critical evidence enhances the reliability of the trial process [since the] duty of the prosecution is not simply to obtain convictions, but to ' "fully and fairly present to the court the evidence material to the charge." ' [Citation.]" (26 Cal.3d at p. 177.)

By not seizing evidence at the time they are first aware or should be aware of its materiality, the police leave the door open for its loss or destruction, and the defense is forever deprived of the opportunity to evaluate its utility. "Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth . . . ."[3] (*In re Ferguson, supra,* 5 Cal.3d at p. 531.) That goal is furthered by requiring the government to seize material evidence.

This court and courts in other jurisdictions have suggested that the government has a duty to seize evidence under certain circumstances. In *People v. Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93], quoted with approval by the majority (*ante,* at p. 86), this court stated that "[t]here might be cases in which this court would impose sanctions for a failure to obtain evidence." However, *Hogan* found no duty to collect fingernail scrapings from a murder victim's body, reasoning that it was "highly implausible that the scrapings could have produced favorable evidence on the issue of guilt." (*Hogan, supra,* 31 Cal.3d at p. 851, citing *Hitch, supra,* 12 Cal.3d at p. 649.)

In *State v. Havas* (1979) 95 Nev. 706 [601 P.2d 1197], the prosecution failed to produce a rape victim's pants and undergarments for inspection when requested by the defense. The garments had either been "lost, destroyed or simply not taken into possession during the investigation . . . ." (*Ibid.*)

Affirming the trial court's judgment of dismissal, the Nevada Supreme Court held that the prosecution should have acquired and preserved the evidence in question because of its "potential relevance to the guilt or innocence of [the] accused . . . ." (601 P.2d at p. 1198.) The court went on to note that such a duty does not place an undue burden on the prosecution. Before disposing of such evidence, the court stated the prosecution must petition the trial court to determine a course of action "consistent with the interests of the parties." (*Ibid.*)

---

[3] " 'Our courts are not gambling halls but forums for the discovery of truth.' " (*People v. Geiger* (1984) 35 Cal.3d 510, 520 [199 Cal.Rptr. 45, 674 P.2d 1303], quoting *People v. St. Martin* (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].)

The Colorado Supreme Court has fashioned a similar rule. "The failure of the state *to collect* and preserve evidence, when those acts can be accomplished as a mere incident to the procedure routinely performed by state agents, is tantamount to suppression of that evidence. It is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee ' "might" be "favorable" to the accused.' [Citations.]" (*Garcia* v. *Dist. Ct.* (1979) 197 Colo. 38, 46 [589 P.2d 924], italics added; accord *People* v. *Gomez* (1979) 198 Colo. 105, 111 [596 P.2d 1192], cert. den. (1982) 455 U.S. 943 [71 L.Ed.2d 655, 102 S.Ct. 1439]; *People* ex rel. *Gallagher* v. *Dist. Court, Etc.* (Colo. 1983) 656 P.2d 1287, 1291.)

Reversing a drunk driving conviction, the *Garcia* court applied its three-prong test to determine whether the state's failure to provide the accused with a separate sample of his breath for independent testing denied him due process: "(1) whether the evidence was suppressed or destroyed by the prosecution; (2) whether the evidence is exculpatory; and (3) whether the evidence is material to the defendant's case." (*Garcia, supra,* 197 Colo. at pp. 45-46.)

The court recognized the impossibility of determining whether destroyed evidence was in fact exculpatory. For that reason, "[i]t is not necessary for a defendant to demonstrate that the evidence he seeks to discover, but which is no longer available for examination by the court, would have been favorable to him, . . . so long as that evidence is not merely 'incidental' to the prosecution's case or to the defendant's affirmative defense. . . . It is sufficient that the material requested ' "might" be "favorable" to the accused.' " (*Id.,* at p. 46, citations omitted.)

The court also held that the state's failure to collect and preserve the evidence was tantamount to suppressing it, where the acts of collecting and preserving the evidence can be accomplished as a mere incident to a state agent's routine procedures. (*Ibid.*)

In *People* v. *McCann* (1982) 115 Misc.2d 1025 [455 N.Y.S.2d 212], the police failed to seize the victim's blood-stained trousers and failed to preserve blood scrapings which they had obtained at the scene of the assault. The defense moved for a dismissal on the ground that these omissions violated the accused's due process rights. (*Id.,* at pp. 213-214.)

The court granted the motion. In addition to finding that the police acted irresponsibly in discarding a blood scraping sample without testing it, the court chided the police for permitting the victim to wear her bloodstained pants home and then neglecting to obtain them. (*Id.,* at p. 215.) Recognizing

the materiality of such evidence, the court held that the police should be required to preserve blood samples of the perpetrator found at the scene of a crime. This rule applies regardless of whether the accused was a suspect at the time of the investigation. (*Id.*, at pp. 213, 216.)

*People* v. *Molina* (1983) 121 Misc.2d 483 [468 N.Y.S.2d 551], lends further support for the proposition that the police have a duty to collect material evidence. There, the police failed to capture and preserve a breath sample for independent testing by the defense. (*Id.*, at p. 553.) "[T]he failure of the State *to collect* and preserve evidence, when those acts can be accomplished as a mere incident to a procedure routinely performed by State agents, is tantamount to suppression of that evidence. [Citation.]" (*Id.*, at p. 556, italics added.) "[B]asic fairness and the duty to make of the trial a search for truth informed by all relevant material requires that the police preserve for the defendant's use a separate breath sample for testing and analysis." (*Id.*, at p. 558.)

Finally, there is *State* v. *Brown* (Iowa 1983) 337 N.W.2d 507. There, a blood sample obtained from an individual arrested for involuntary manslaughter was destroyed by hospital personnel before it could be made available for testing by the defense. Citing *Hitch* with approval, the Iowa Supreme Court ruled that when the state decides to use the fruits of physical evidence against the accused, there exists "a corresponding obligation *to acquire* and preserve, within the bounds of reasonableness, the underlying physical evidence." (*Id.*, at p. 510, italics added.)

It is noteworthy that all of these out-of-state courts speak of a duty to seize in the same breath as a duty to preserve. (See, e.g., *State* v. *Havas, supra,* 601 P.2d at p. 1198 ["acquired and preserved"]; *Garcia* v. *Dist. Ct., supra,* 197 Colo. at p. 46 ["collect and preserve"]; *People* v. *Molina, supra,* 468 N.Y.S.2d at p. 556 ["collect and preserve"]; *State* v. *Brown, supra,* 337 N.W.2d at p. 510 ["acquire and preserve"].) This strongly supports the premise that a duty to seize goes hand in hand with a duty to preserve.

The foregoing authority and reasoning compel the conclusion that the police have a limited duty to seize material evidence. Such a duty should arise when (1) the evidence and its materiality[4] are known to, or should

---

[4] "[T]he burden of establishing that the evidence is material is met when the defendant shows that there is 'a reasonable possibility that the evidence . . . would have constituted favorable evidence on the issue of guilt or innocence. (*People* v. *Hitch, supra,* 12 Cal.3d at p. 649.)' [Citations.] This burden is met when the evidence by its nature could reasonably be used to impeach the credibility of the prosecution witness' testimony regarding the evidence." (*People* v. *Moore* (1983) 34 Cal.3d 215, 220 [193 Cal.Rptr. 404, 666 P.2d 419].)

*People* v. *Hogan, supra,* 31 Cal.3d at page 851, is consistent with this materiality test, since it applied the *Hitch* standard in concluding that there was no duty to obtain the evidence in that case. (See dis. opn., *ante,* at p. 93.)

reasonably have been apparent to, the police; (2) the evidence is either readily accessible to the prosecution on request or may be obtained by legal process; and (3) the evidence or its equivalent can reasonably be retained by the state pending discovery.

This test properly balances the accused's due process right to fair access to evidence with the state's interest in avoiding burdensome procedures. The requirement that the materiality of the evidence be known or reasonably apparent to the police ensures that the state will not be required to gather up everything which might be beneficial to the defense. The mandate that evidence be reasonably accessible to the prosecution ensures that no extraordinary efforts will be required to seize it.

Lastly, the requirement that the evidence be of a type reasonably retainable accommodates the state's interest in avoiding any excessive burden that might be involved in seizing and preserving certain types of evidence. (See, e.g., *People* v. *Heideman* (1976) 58 Cal.App.3d 321, 336-337 [130 Cal.Rptr. 349] [no *Hitch* error in destroying unstable dynamite]; *People* v. *Porpora* (1979) 91 Cal.App.3d Supp. 13, 23 [154 Cal.Rptr. 400] [no *Hitch* error in failing to preserve 71½ tons of fish which appellant delivered to a cannery to be commingled with other catches]; see also *People* v. *Tolhurst* (1982) 139 Cal.App.3d 1, 5 [188 Cal.Rptr. 474] [destruction of a large quantity of marijuana in compliance with Health & Saf. Code, § 11479 does not violate due process under *Hitch*].)[5]

In many cases, any additional burden which a duty to seize imposes on the government is insignificant or nonexistent. For example, in a rape case in which a semen sample is obtained by a private entity rather than by the police, the prosecution will normally retrieve the sample as part of its investigation. In this situation, a duty to seize material evidence whose existence is known to the police imposes no burden beyond that which the investigation otherwise entails. This case also illustrates that point. The police were well aware of the materiality of the videotape, since they "seized" portions of it in the form of still photographs. Its seizure and subsequent preservation would have involved no extraordinary burden.

There can be no dispute that a videotape of a crime is a material piece of evidence. The police were obviously aware of that fact, since they took

---

[5]The consequences of a breach of the duty to seize must, of course, be determined on a case-by-case basis. In some cases, like this one, where the loss of material evidence was attributable solely to the prosecution, sanctions are appropriate. In other cases, where the loss of such evidence is equally attributable to the prosecution and defense, sanctions may not be appropriate. (See dis. opn., *post*, at p. 99.)

photographs of the tape and testified that they requested the store owners to preserve it.

Furthermore, by all accounts, the videotape was the centerpiece of the prosecution's case against appellant. Eduardo Gonzalez, the only eyewitness to the robbery, could describe only the clothing and the general physical characteristics of the robbers. He had never seen them before. He described the freeze-frame photographs as "blurry," and he could not identify appellant as the robber on the basis of those photos. At the jurisdictional hearing, Gonzalez was somewhat equivocal and testified that "I'm not so sure but I think it's [appellant]." He also admitted that when he chose appellant's photograph from a six-photograph display, he told Sergeant Maddux that he was not certain of his choice.

The videotape-based identification made by Ms. Thomas was the link which caused the police to focus their attention on appellant. Thomas had no other basis for identifying appellant as the robber. The freeze-frame photographs taken by the police were of such poor quality that Ms. Thomas could make no positive identification independent of her recollections from having viewed the videotape.

All of this points to the conclusion that the videotape bore directly on the accuracy of the identifications—the central issue in this case. Surely, there was a " 'reasonable possibility that [this] evidence, if preserved, would have constituted favorable evidence on the issue of guilt or innocence' . . . [since] by its nature [it] could reasonably be used to impeach the credibility of the prosecution witness' testimony . . . ." (*People* v. *Moore, supra,* 34 Cal.3d at p. 220.) Thus, the materiality prong of the test was clearly satisfied.

The videotape was also readily accessible to the police. If they had attempted but failed to obtain the videotape by consent, they could have easily obtained it by a search warrant or a subpoena issued soon after the February 16th photo session.

Lastly, the videotape could have easily been retained by the state pending discovery. Storing it for a few months until the defense had an opportunity to decide whether to examine it would have posed no onerous burden.

All three prongs of the test were satisfied. In addition, the loss of the tape was in no way attributable to appellant. As a result, the police erred in failing to seize the videotape, and under the law sanctions are the appropriate remedy.

III.

A limited duty to seize will not ignite the parade of horribles which Justice Lucas's concurring opinion envisions. (See conc. opn., *ante,* at p. 89.) Contrary to his assertions, the three-pronged test does not place on the police "a burden to seize all potentially 'useful' or 'material' evidence when investigating a crime . . . ." (*Ibid.*) Rather, the test prescribes a much narrower duty. The police are required to seize *only* that evidence which they know or should know is material, readily accessible and reasonably retainable. Such a duty is easily dischargeable and does *not* require that "the scene of every crime . . . be preserved in a time capsule pending the final resolution of the question of guilt . . . ." (Conc. opn., *ante,* at p. 89.)

The cases relied on in the concurring opinion for the premise that no duty to seize exists are inapposite. (See conc. opn., *ante,* at p. 88.) In *People* v. *Bradley* (1984) 159 Cal.App.3d 399 [205 Cal.Rptr. 485], the Court of Appeal noted that "[o]nly in rare cases would well-trained and diligent law enforcement officers fail to seize a piece of evidence that is so obviously material that it could conclusively convict or exonerate a defendant. *While police might have a duty at some point to seize an item of evidence,* they have no duty to make defendant's case for him in the course of an investigation." (*Id.,* at pp. 408-409, italics added.) Thus, *Bradley* recognized that a duty to seize evidence may exist in certain cases.

Further, the *Bradley* court emphasized that the prosecution's case rested primarily on the victim's eyewitness testimony. (159 Cal.App.3d at p. 408.) The case against Bradley was not dependent on the bloodstained articles which the police failed to collect from the scene of the crime. (*Ibid.*) Thus, the failure to seize them may have been harmless error.

*People* v. *Cooper* (1979) 95 Cal.App.3d 844 [157 Cal.Rptr. 348] and *People* v. *Watson* (1977) 75 Cal.App.3d 384 [142 Cal.Rptr. 134] are also distinguishable. Under the test enunciated above, the police would not have been required to seize the evidence at issue in either case.

In *Cooper,* the police failed to lift latent fingerprints from a plastic bag containing heroin. There was no indication that the police were or should have been aware that the fingerprints were material. Thus, under the proposed rule, a duty to seize would not arise. In addition, there was no indication that the fingerprints had in fact been destroyed, thereby depriving the defense of an opportunity to examine them. (*Cooper, supra,* 95 Cal.App.3d at pp. 850-851.)

In *Watson,* the accused complained that the prosecution should have tested soil particles on his boots and garments. However, a criminalist testified

that "nothing was found on them to connect defendant to the scene of the crime." (75 Cal.App.3d at p. 400.) It is understandable then why the court observed that the police were not required to "gather up everything which might eventually prove useful to the defense." (*Ibid.*) The proposed test would impose no such burden on the prosecution.

As the concurring opinion notes, in *In re Koehne* (1960) 54 Cal.2d 757 [8 Cal.Rptr. 435, 356 P.2d 179], a case decided before *Hitch,* the court did state that "the law does not impose upon law enforcement agencies the requirement that they take the initiative, or even any affirmative action, in procuring the evidence deemed necessary to the defense of an accused." (54 Cal.2d at p. 759.) However, this statement must be understood in context.

*Koehne* involved a drunk-in-public prosecution. The accused failed to request permission to have a doctor take a sample of his blood upon arrest. Since the opportunity to do so was lost through the accused's own inaction, it is understandable why the court held that "it is only when he is denied an opportunity, reasonable under the circumstances, to procure a timely sample of his blood that he can properly claim a denial of due process." (*Koehne, supra,* 54 Cal.2d at p. 759.)

*People* v. *Newsome* (1982) 136 Cal.App.3d 992 [186 Cal.Rptr. 676], is similarly distinguishable. Citing *Koehne*'s "general rule," *Newsome* held that "*after the prosecution has made a timely notification to the defense of the existence of the evidence and the defense fails in a timely fashion to avail itself of the evidence,* subsequent deterioration of the evidence attributable to the passage of time cannot be said, as a matter of law, to be attributable to the prosecution." (*Id.,* at p. 1006, italics added.) Again, it is significant that the defense had been notified of the existence of the evidence (a semen sample) so that the accused's interests could have been protected.

The concurring opinion's reliance on the "general rule" that the police need not take any affirmative action in procuring evidence necessary to an accused's defense ignores the fact that during the investigatory stage of a crime the accused cannot protect his interests. This case illustrates this point well. The robbery occurred on February 13, 1982. The responding officer viewed the tape the same day. Two investigating officers viewed it on February 16th. The store owner testified that she did not think she had to keep the tape after the investigating officers viewed and photographed it. So, she recorded over it. These facts suggest that the tape may have been destroyed as early as February 17th, *over three months before* appellant's arrest which occurred on May 21st. Putting aside the fact that appellant may not have

had counsel until his first hearing on May 25th, how could he have been expected to protect his own interests before his arrest?

Both the majority and concurring opinions conclude that there was no police misconduct warranting sanctions here. (Maj. opn. *ante,* at p. 87; conc. opn., *ante,* at p. 89, fn. 3.) I disagree. The police viewed the videotape at least twice. They knew its significance and materiality for they photographed certain portions of it. Obviously, they realized from the time of their initial contact with Ms. Thomas, the store owner, that the tape would be material evidence against the robber and would constitute the foundation of the prosecution's case. To permit the store owners to retain it was to place in jeopardy the evidentiary centerpiece of the case against appellant.

By not seizing the evidence when they could have, the police left open the possibility that the evidence would be lost or destroyed. Such actions call for sanctions even where the loss was unintentional or inadvert. (*People* v. *Goss* (1980) 109 Cal.App.3d 443, 455 [167 Cal.Rptr. 224]; *People* v. *Chambers* (1980) 108 Cal.App.3d 985, 989 [166 Cal.Rptr. 815]; *People* v. *Swearingen* (1978) 84 Cal.App.3d 570, 574-575 [148 Cal.Rptr. 755]; see also *People* v. *Bailes* (1982) 129 Cal.App.3d 265, 273-274 [180 Cal.Rptr. 792].)[6]

The majority also claim that the "record discloses that the police officers investigating the robbery asked the Thomases to release the tape to their custody. When the Thomases refused, the officers directed them not to erase the tape, and the Thomases agreed." (Maj. opn., *ante,* at p. 87.) The majority apparently rely on the testimony of one of the investigating officers to support this assertion.

---

[6]The concurring opinion also finds that sanctions are unnecessary since "the officers undoubtedly have already suffered from the [tape's] erasure: their case against defendant was considerably weakened, and they presumably were reprimanded by their superiors." (Conc. opn., *ante,* at p. 89, fn. 3.) Not only is this statement fraught with conjecture and surmise, but it shows a complete lack of understanding of the duty-to-seize rule.

The conclusion that the "case against defendant was considerably weakened" by the loss of the tape (conc. opn., *ante,* at p. 89, fn. 3), assumes that the tape was inculpatory. However, it is established that when "the evidence in question is no longer available, it is *impossible* for this or any court to determine whether in fact the [evidence] would have been favorable evidence to the defendant." (*People* v. *Moore, supra,* 34 Cal.3d at p. 221, italics added; see also *Hitch, supra,* 12 Cal.3d at p. 648.) How, then, can Justice Lucas, flatly ignoring this mandate, divine that "the possibility that the tape contained exculpatory evidence was remote" (conc. opn., *ante,* at p. 89, fn. 3)?

Further, the speculative assumption that the officers have been reprimanded for their omissions, misses the point. The sanctions required by cases in both the informant disclosure and duty-to-preserve contexts have always been imposed *on the prosecution in the case in which the omissions or errors were committed.* I know of no case in which administrative discipline against the errant officers was permitted to substitute for judicially imposed sanctions when an accused's constitutional right to a fair trial was abridged.

However, a complete reading of the record paints a somewhat different picture. Ms. Thomas testified that on the night of the robbery, the officer told her to keep the tape "so that [some investigators] could see it." She "thought [she] didn't have to keep it after that . . . and so [she and Mr. Thomas] recorded over it."

Ms. Thomas was not present when the investigators later viewed the tape, but Mr. Thomas was. He testified that he could not recall whether the officers instructed him to preserve the tape. However, he did recall telling an investigator for the public defender's office that he was "not instructed by anybody to preserve the tape." The majority completely ignore the Thomases' testimony. Viewed in this context, the investigating officer's testimony should not be given unquestioning deference.

IV.

Had the police seized the videotape in this case, they would have been required by *Hitch* to preserve it for examination by the defense. This conclusion is in no way undermined by the United States Supreme Court's recent decision in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528].

In *Trombetta,* the Supreme Court stated that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422, 104 S.Ct. at p. 2534], fn. & citation omitted.) This materiality standard is arguably different from that announced in *Hitch,* which requires the accused to show only a "reasonable possibility" that the evidence would have constituted "favorable evidence on the issue of guilt or innocence." (*Hitch, supra,* 12 Cal.3d at p. 649.)

However, assuming that the two standards are different and that *Trombetta* requires a more demanding showing of materiality,[7] I believe it necessary to emphasize that the duty-to-preserve principles announced in *Hitch* rest on independent state grounds.

---

[7]This assumption renders it unnecessary to address amicus state public defender's argument that the standard announced in *Trombetta* is "functionally identical" and consistent with *Hitch*.

It is significant that *Trombetta* declined to cast doubt on *Hitch*. Rather, the Supreme Court made it clear that state courts are free to adopt "more rigorous" standards than those imposed by the federal Constitution. (*Trombetta, supra,* 467 U.S. at p. 491 [81 L.Ed.2d at pp. 423-424, 104 S.Ct. 2535], fn. 12.) As Justice O'Connor observed in her concurrence, "[r]ules concerning preservation of evidence are generally matters of state, not federal constitutional law." (*Id.,* at p. 2535 (conc. opn.).)

It is incontrovertible that "the California Constitution is, and always has been, a document of independent force" (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099]) and that "state courts, in interpreting constitutional guarantees contained in state constitutions, are *'independently responsible* for safeguarding the rights of their citizens.'" (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 261 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118], quoting *Brisendine, supra,* 13 Cal.3d at p. 551.)

"A blind following of Supreme Court precedent would frustrate our ability to protect rights enjoyed by Californians and to maintain consistency in California law. (See Mosk, *The State Courts,* in American Law: The Third Century (Schwartz edit. 1976) 213, 217-220.) If the United States Supreme Court hands down a decision which limits rights established by earlier precedent in a manner inconsistent with the spirit of the earlier opinion, it may become incumbent upon this court to employ the California Constitution to maintain consistent principles protecting those rights. (See *People* v. *Disbrow* (1976) 16 Cal.3d 101, 115 [127 Cal.Rptr. 360, 545 P.2d 272].) 'Respect for our Constitution as "a document of independent force" [citation omitted] forbids us to abandon settled applications of its terms every time changes are announced in the interpretations of the federal charter.' (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108].)" (*People* v. *Bustamante* (1981) 30 Cal.3d 88, 97 [177 Cal.Rptr. 576, 634 P.2d 927].)

*Hitch* relied to a large extent on the rationale of this court's informant disclosure cases. (*Hitch, supra,* 12 Cal.3d at pp. 648-650.) Under those cases, in order to obtain the identity of an informant, an accused need only demonstrate a "reasonable possibility" that the informant could give evidence on the issue of guilt which might result in the accused's exoneration. (*Price* v. *Superior Court* (1970) 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721]; *Hitch, supra,* 12 Cal.3d at pp. 648-649.)

That test constitutes a "California doctrine of independent existence." (*Cordova* v. *Superior Court* (1983) 148 Cal.App.3d 177, 184 [195 Cal.Rptr. 758].) In *Cordova,* the Court of Appeal attempted to determine

the foundational underpinnings of the California authority relied upon in *Hitch.*[8] Although its examination proved inconclusive as to whether that authority was based upon the federal or the state due process clause, that examination did uncover that "the California rule of materiality, as it relates to informer witnesses, has been thoroughly imbedded in California law for a substantial period of time. It has been applied, interpreted and reinterpreted in light of numerous factual situations in hundreds, if not thousands, of cases in the trial and appellate courts of this state. It continues to be applied in paid informer cases [citations] and to informers who are not police agents [citation]. By analogy, the same test of materiality has been applied to the preservation and production of demonstrative evidence, such as a breathalyzer test ampoule [citation] and to semen samples [citations], among others. . . ." (*Id.,* at pp. 183-184.)

Thus, *Cordova* concluded, "[i]n light of the consistent and widespread use of this test of materiality and the extensive reliance on it in California, in the interests of certainty, stability, predictability and consistency in the law, it would be unwise to change the rule at this juncture. It has, in effect and in practice, become a California doctrine of independent existence." (*Cordova, supra,* 148 Cal.App.3d at p. 184.) Similar reasoning, in my view, compels the conclusion that *Trombetta* has not altered the California rule of materiality applied in *Hitch.*

"Procedures necessary to ensure reliability in the fact finding process when the state participates in the deprivation of personal liberty are required by due process. (Cal. Const., art. I, § 15 . . . .)" (*People* v. *Geiger, supra,* 35 Cal.3d at p. 520.) Article I, sections 7 and 15 of the California Constitution guarantee a "fundamentally fair decision-making process." (*People* v. *Ramos* (1984) 37 Cal.3d 136, 153 [207 Cal.Rptr. 800, 689 P.2d 430]; see also *People* v. *Ramirez* (1979) 25 Cal.3d 260, 268 [158 Cal.Rptr. 316, 599 P.2d 622].) As this court long ago held in *People* v. *Riser* (1956) 47 Cal.2d 566, 586 [305 P.2d 1], "the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of wit-

---

[8]The *Cordova* court was confronted with the question of whether United States Supreme Court's decision in *United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440] changed the California rule of materiality applied in *People* v. *Mejia* (1976) 57 Cal.App.3d 574 [129 Cal.Rptr. 192]. Under *Valenzuela-Bernal,* an accused asserting that he was deprived of a fair trial because a material witness was deported and thus made unavailable through prosecutorial action or inaction is required to show that the witness' testimony "would be both material and favorable to the defense." (458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].) Under *Mejia,* the accused need only demonstrate that there exists a "reasonable possibility" that the witness, if available, would give evidence which would exonerate him. (57 Cal.App.3d at p. 580.) The *Cordova* court concluded that the California rule of materiality was not changed by the Supreme Court's decision in *Valenzuela-Bernal.* (*Cordova, supra,* 148 Cal.App.3d at p. 185.)

nesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits."

To hold an accused who has been deprived of relevant material to the higher standard of materiality enunciated in *Trombetta* would undermine the state's interest in an accurate and reliable process. Thus, this state's interest in preventing unwarranted deprivations of personal liberty and in assuring reliable decisionmaking requires the continued safeguards supplied by *Hitch*.

## V.

With respect to whether sanctions should be imposed for the failure of the police to seize and preserve the videotape, Justice Smith of the First Appellate District wrote a most persuasive opinion for a unanimous panel which I herewith reprint and adopt as my own:*

*Hitch* holds that sanctions for nondisclosure due to loss or destruction should not be imposed if the [[state]] can show "that the governmental agencies involved have established, enforced and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve the [evidence]" (12 Cal.3d 641, 652-653). However, the [[state]] did not meet [[its]] burden here. Nothing in the record even suggests that reliance on the Thomases to preserve the videotape was part of rigorous and systematic preservation procedures. []

Having concluded that the officers failed in their duty to seize and preserve the videotape evidence and that the unintentional loss of that evidence was not guarded against by good faith adherence to rigorous and systematic procedures, [[the court is]] left to decide what sanctions are appropriate. "[T]he courts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence. '[N]ot every suppression of evidence requires dismissal of charges . . . . The remedies to be applied need be only those required to assure the defendant a fair trial.' [Citation.]" (*People* v. *Zamora* (1980) 28 Cal.3d 88, 99 [167 Cal.Rptr. 573, 615 P.2d 1361].) Factors which guide the exercise of that discretion include (1) the particular circumstances attending the loss or destruction, (2) the materiality of the evidence and (3) the impact of the sanctions on future cases and future police conduct. (*Id.*, at p. 100.)

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; double brackets enclosing material are used to denote additions. (See *Conservatorship of Early* (1983) 35 Cal.3d 244, 247 [197 Cal.Rptr. 539, 673 P.2d 209].)

Consideration of those factors and the nature of the due process violation in this case convinces us that the appropriate sanction is exclusion of all evidence which might have been impeached by the erased videotape.[[9]] As was observed in *Brown* v. *Municipal Court* (1978) 86 Cal.App.3d 357, at page 363 [150 Cal.Rptr. 216], "[w]here potentially impeaching evidence on behalf of a defendant is suppressed [by virtue of its loss or destruction], due process does not require dismissal of the action, but only exclusion of the prosecution's evidence which might have been impeached by the evidence suppressed." Another fact weighing in favor of exclusion rather than dismissal is that destruction of the videotape was not due to intentional or bad faith actions of the officers. (*Hitch, supra,* 12 Cal.3d 641, 653 & fn. 6; *People* v. *Goss, supra,* 109 Cal.App.3d 443, 456.) The [[state does]] not suggest that any lesser sanction than exclusion is appropriate.

Exclusion of evidence which might have been impeached by the videotape means that much of the testimony of Mr. and Mrs. Thomas, Sergeant Maddux and Eduardo Gonzalez should not have gone to the trier of fact. Additionally, [] the warrant authorizing the search of appellant's home and the photographic lineup identification by Gonzalez were almost exclusively products of the videotape viewings and thus should also have been removed from the trier's consideration. Without Mrs. Thomas' recognition of the suspect from the videotape and her having given the officer the suspect's name and address, Sergeant Maddux would have had only Gonzalez' general description of the suspect's clothing and approximate weight and height by which to assemble a photographic lineup. Nothing in that description could have given Maddux reason to include appellant's photograph in the lineup.

Regardless of how quickly or surely Gonzalez may have selected appellant's photo and irrespective of whether Gonzalez' identification was based entirely on recollections of the robbery, the lineup itself would have been impossible to stage without the videotape-induced identification. The reporter's transcript reveals that the warrant was obtained upon the strength of averments that the affiant had viewed the videotape and observed the

---

[[9]][[Justice Lucas misrepresents my opinion as suggesting that an exclusionary rule should be applied whenever the police fail to seize material evidence. (See conc. opn., *ante,* at p. 89, fn. 3.) He relies in part on Proposition 8 to conclude that an exclusionary sanction "is far too strict." (*Ibid.*)

First, I note that Proposition 8 is not applicable to this case since the robbery occurred prior to its effective date. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) Therefore, an exclusionary sanction is entirely appropriate here. Second, other remedies are available. As previously discussed, an appropriate sanction is one which will permit a fair trial. (See *People* v. *Zamora, supra,* 28 Cal.3d at p. 99; dis. opn., *ante,* at p. 104.) Even if exclusion were not available, adverse findings on critical issues, jury instructions relating to the destruction of the material evidence or dismissal of the prosecution may be appropriate.]]

suspect's clothing, that Mrs. Thomas had identified the suspect as appellant and that Gonzalez had positively identified appellant out of the photographic lineup discussed above. []

All of the above information came from the videotape viewings. The only untainted evidence available to police at the time the warrant was obtained, according to the record before us, was the victim's initial, general description. This general description, which provides no hint as to where to search, could not support probable cause.

In conclusion, [] the court below erroneously denied appellant's *Hitch* motion and [] the sanction of exclusion should have been imposed. In assessing prejudice caused by *Hitch* error, "the reviewing court need not reverse the conviction if the absence of the evidence (or . . . the presence of evidence which might have been impeached by the missing evidence) was 'harmless beyond a reasonable doubt' [citations]." (*People* v. *Goss, supra,* 109 Cal.App.3d 443, 458; *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Here, the evidence which should have been excluded constituted virtually the whole case against appellant. Its admission was clearly prejudicial in the constitutional sense, requiring reversal. (Cal. Const., art. VI, § 13.)

## VI.

A duty to seize evidence logically arises at the time a crime is first investigated. Recognizing a limited duty on the police at that point in the criminal process "ensure[s] that rights recognized at one stage . . . will not be undercut at other less visible, stages" and "make[s] of the trial a search for truth informed by all relevant material." (*United States* v. *Bryant, supra,* 439 F.2d at pp. 642, 648.) Such a duty does not place undue burdens on the government but ensures that the trial is a bona fide search for truth.

Here, the police were fully aware of the videotape and its materiality. It was readily accessible by means of legal process and could have easily been seized and retained. The failure to do so was reversible error.