Filed 6/24/13  P. v. Mukhtar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061039 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD222706) |
| FAHIYEH MUKHTAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joseph P. Brannigan, Judge.  Affirmed.

Jerry M. Leahy for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General for Defendant and Respondent.

## INTRODUCTION

A jury convicted Abdikidir Abdillahi Guled[1] of attempted murder (Pen. Code,[2] §§ 187, subd. (a), 664), discharging a firearm from a motor vehicle (former § 12034, subd. (c), now § 26100, subd. (c)), and assault with a firearm (§ 245, subd. (a)(2)). As to count 1, the jury found true allegations the offense was willful, deliberate and premeditated (§ 189). As to counts 1 and 2, the jury found true allegations Guled intentionally and personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). As to count 3, the jury found true allegations Guled personally used a firearm (§ 12022.5, subd. (a)), and personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). Guled additionally admitted being out on bail at the time of the offenses (§12022.1, subd. (b)).

The court sentenced Guled to life in prison with the possibility of parole for count 1, plus 25 years to life for the attendant firearm discharge enhancement finding, plus 2 years for the attendant on bail enhancement finding.[3] The court stayed the sentences for the remaining counts and enhancement findings under section 654.

---

[1]    Official court documents list appellant's name as either "Fahiyeh Mukhtar" or "Mukhtar Fahiyeh." Appellant indicated below his true name is "Abdikidir Abdillahi Guled" and, at his request, the court referred to him by this name. We do the same for consistency.

[2]    Further statutory references are also to the Penal Code unless otherwise stated.

[3]    The court also sentenced him to an additional five years for an unrelated narcotics offense.

Guled appeals, contending: (1) the court denied him his right to testify or, alternatively, failed to obtain his express waiver of his right to testify; (2) his counsel provided ineffective assistance by failing to call him as a witness; (3) the photographic lineup of him was unduly suggestive and the pretrial identifications of him were unreliable; (4) the court abused its direction by excluding the testimony of his cultural expert; and (5) there was insufficient evidence he possessed the requisite mental state for attempted murder. We conclude these contentions lack merit and affirm the judgment.

BACKGROUND

*Prosecution Evidence*

At around 2:00 a.m., on August 17, 2009, Abdiwali Hassan and Ahmed Ismail went to a restaurant after attending a Somali wedding. At the restaurant, they met up with Ismail Mire. As the three men stood in the parking lot talking to one another and to others who had also attended the wedding, they saw Guled standing next to a silver Toyota Camry smoking a cigarette. Saynab Jama was sitting in the front passenger seat of the car.[4] Mire recognized the car as one frequently driven by Guled's sister, who had moved to Germany four days earlier.

---

[4]    Jama was jointly tried with Guled. The jury convicted her of the same offenses and found true related enhancement allegations. We affirmed her conviction on appeal and denied a companion habeas petition. (*People v. Jama* (Jan. 17, 2013, D059604/D062197) [nonpub. opn.].) Given our decision in Jama's case, we need not address Guled's request to join in any issues raised by her that might benefit him.

Ismail looked in Guled's direction.  Guled nodded at Ismail, but Ismail ignored him because they did not know one another.  Guled subsequently walked up to Mire and demanded a cigarette.  Guled smelled like alcohol.  Mire found Guled's demeanor offensive and falsely told Guled he did not have any cigarettes.  Guled returned to the Camry and started to drive slowly around the parking lot.  Mire and three friends approached the driver's side of the Camry and Mire asked Guled, "What's going on?  Is there any problem?"  Guled responded, "No, I'm cool, I'm cool."

Mire started walking toward Ismail, who was waiting by Mire's car.  As Mire approached Ismail, Guled stopped the Camry, but kept the engine running.  Guled and Jama got out the car and went to the trunk.  Jama handed Guled a dark colored object and they both got back into the car; however, this time Jama was driving and Guled was in the front passenger seat.  Jama drove the Camry forward and stopped it.  Guled leaned his torso out of the passenger's side window, holding a gun.  He fired three or four shots at Ismail and Mire.  He fired the first shot up and to Ismail's side.  Ismail turned and started to run when the second shot struck and broke his right femur.  Ismail backed against Mire's car and sunk down as the third shot struck the ground approximately three feet to the right of him.  Jama and Guled then sped away in the Camry as Jama laughed and Guled yelled, "You're going to get it."

A San Diego police officer who responded to the scene found and collected a bullet.  A criminalist analyzed this bullet and another taken from Ismail's leg.  The criminalist determined the bullets were fired from the same gun.  The list of guns that could have fired the bullets included several revolvers and one semiautomatic gun.  An investigator with the

4

district attorney's office believed the gun that fired the bullets was most likely a revolver because no casings were found at the scene.

Sergeant Patti Clayton, a supervisor in the San Diego police department's multicultural community relations office, met Jama when Jama was a teenager and mentored her. In March 2009, Jama told Clayton she was dating Guled. Clayton frequently saw Guled and Jama driving around together. Clayton learned of the shooting at a morning briefing two days after the shooting occurred. When she heard the descriptions of the suspects, she told a police detective the suspects may be Guled and Jama.

Ismail and Mire identified Guled and Jama from photographic lineups and in court. Hassan tentatively identified Guled from a photographic lineup, but could not identify Jama. However, Hassan positively identified Guled at trial, explaining that at the time of the photographic lineup he was afraid to make an identification.

Clayton learned a car matching the description of the one used in the shooting was registered to one of Guled's sisters. An investigator with the district attorney's office attempted but was never able to locate the car.

*Defense Evidence*

Guled's sister and niece testified they went to the wedding with Guled, then to the restaurant for about 15-20 minutes, and then straight home. Guled stayed at his sister's home until 8:00 a.m. the next morning.

A San Diego Somali community member who attended the wedding testified he was leaving the restaurant when he heard two gunshots. He saw two African-American men run to a black car, get in, and drive away. The community member knew Jama. He did not

5

know Guled, but had previously seen him in the community. He did not see either of them at the restaurant. He also did not see a gray or silver car speed away from the restaurant after the shooting.

Another person who attended the wedding and went to the restaurant afterwards testified he saw Guled at the wedding, but not at the restaurant. However, as he was leaving the restaurant, he saw two African-American men arguing. A Somali man started arguing with them. Ismail went over to the men to see what was going on. A short while later, some African-American men drove by in a black sports utility vehicle. One of the men came out of the right rear window of the car and fired a revolver at Ismail and Mire.

Jama and her sister testified they stayed at home while their other family members attended the wedding. Jama went to bed before midnight and never left the house.

Jama additionally testified Guled did not smoke around her and did not drive when they were together because he did not have a car or a valid driver's license. She further testified they had broken up and were not in a relationship at the time the shooting occurred.

An elder in the San Diego Somali community testified he had spoken with Ismail and asked Ismail who shot him. Ismail said he did not know.

*Prosecution Rebuttal*

Ismail testified he had never met the elder and had not talked to an elder about the shooting.

6

DISCUSSION

I

*Right to Testify*

A

Before defense counsel began presenting his case, the court asked Guled's defense counsel how many witnesses he had and who they were. Defense counsel named a few possible witnesses, including Guled. After calling two witnesses, defense counsel reached a point where he had to decide whether to recommend Guled testify to provide the factual foundation for Guled's cultural expert's testimony (see part III.A., *post*.). Defense counsel indicated he had previously discussed the matter with Guled, but needed time to discuss it with him further.

The prosecutor then informed the court that, if Guled testified, the prosecutor would seek to impeach him with prior bad acts. Although the court reserved a final decision until it had more specific information before it, the court tentatively indicated it would allow the impeachment evidence.

Based on the court's tentative decision, defense counsel reiterated he needed time to discuss the matter further with Guled. He also stated that, while Guled had an absolute right to testify, he would advise him not to testify because of the potential impeachment evidence.

When the trial resumed the following afternoon, defense counsel informed the court he had talked to Guled for "a little bit" earlier that day and Guled was not going to testify. The court asked whether there was any "need to have a hearing or anything" and defense

7

counsel stated there was not. The court then remarked, "All right, okay, if that's the decision you've made I'm sure you, with the years of experience, you've discussed it with your client, if that is his decision then I assume at this point you'd be resting." Defense counsel responded, "Yes, your honor."

After Guled's defense counsel formally rested his case and Jama's defense counsel was nearing the completion of hers, the court conducted a jury instruction conference. During the conference, the following exchange occurred:

"THE COURT [to Guled's defense counsel]: . . . Your portion of the evidence has already concluded so the record is clear your client has decided not to testify.

"[DEFENSE COUNSEL]: Correct.

"THE COURT: We didn't have any hearing regarding his prior misconduct. [The prosecutor] indicated he would attempt to use that but you and your client spoke about that and—

"[DEFENSE COUNSEL]: I told [Guled] and I explained to him that this information—adverse information could come in if he took the stand.

"THE COURT: Well, we never had a hearing outside the jury to make that determination, so just I want the record to be clear that you're aware of that information but—

"[DEFENSE COUNSEL]: Yes.

"THE COURT: But we didn't go completely through it line by line. But based on what [the prosecutor] said rather than any ruling that I made you and your client made a decision that it would be appropriate that he not testify; is that right?

8

"[DEFENSE COUNSEL]: Yes. He understands that he has a right to testify under *People v. Robles* [(1970) 2 Cal.3d 205, 215].

"THE COURT: Okay, but it's his decision not to.

"[DEFENSE COUNSEL]: You understand that?

"[GULED]: Yes, your honor."

The prosecutor also informed the court that, during an interview between Guled and Guled's proposed cultural expert, Guled said he had been incorrectly labeled as a gang member. The prosecutor informed defense counsel he was prepared to call the law enforcement officer who classified Guled as a gang member in rebuttal, if necessary. Defense counsel was aware of this possibility when he counseled Guled about whether to testify.

After this exchange, Jama began testifying. During a break in her testimony, Guled's defense counsel informed the court that Guled wanted to reopen his case and testify. After Jama completed her testimony and Jama's defense counsel rested her case, Guled's defense counsel formally moved to reopen his case, indicating Guled "wants to exercise his right to testify under *People v. Robles*."

The court stated it would grant the motion. The court, the prosecutor and Guled's defense counsel then discussed whether the prosecutor could impeach Guled's testimony with prior bad acts. The prior bad acts were: giving a peace officer a false name, lying to a peace officer, and falsely impersonating another. After considering relevant legal authority, including whether the evidence was more prejudicial than probative under

Evidence Code section 352, the court determined the prosecution could use the prior bad acts to impeach Guled's testimony.

After subsequently confirming Guled's defense counsel could reopen his case to allow Guled to testify, the court asked the prosecutor if he had any comments. The prosecutor remarked, "I just need some assurance that this is it because I have [Ismail] waiting all day in the hallway thinking I was going to put him on this morning." The court responded, "Yes, I understand and we want to move the trial along; however, it's [important] that [Guled] have his day in court. If he's changed his mind, and he wants to testify, then he should be able to testify. That's why I'm allowing him to reopen his case and testify."

After a recess, Guled's defense counsel informed the court that Guled wanted another witness to testify. Defense counsel additionally stated he was going to put the witness on and "then I don't know if [Guled] is really going to take the stand. I don't think he is." Defense counsel further noted there was "another little problem that [the prosecutor] may want to discuss because if [Guled] takes the stand and if I go into the tribal stuff, I don't know what you're going to let him do; but there is some immigration judge made a finding in a case [*Guled v. Mukasey* (8th Cir. 2008) 515 F.3d 872] that my client wasn't quite credible with regard to his tribal affiliations."[5]

---

5     Guled's contemplated tribalism defense was based on his purported membership in the Madhiban clan. (See part III.A., *post*.) The Department of Homeland Security initiated removal proceedings against Guled in 2003 and an immigration judge subsequently determined he was removable because of past convictions for domestic violence. (*Guled v. Mukasey*, *supra*, 515 F.3d at p. 876.) Guled applied for both asylum and withholding of

The prosecutor acknowledged he would raise the issue if Guled testified about tribal issues and he had case law supporting the admissibility of the immigration judge's finding. The court clarified, "If he takes the stand and starts talking about tribes and if he doesn't talk about tribes it is not relevant, all right."

After Guled's last-minute witness testified, Guled's defense counsel asked, "May I have just a moment?" The court gave him the requested time and he subsequently announced, "We rest." Guled never testified.

After the trial, Guled substituted in a new attorney, who moved for a new trial in part on the ground Guled had been deprived of his right to testify on his own behalf. At the hearing on the new trial motion, Guled testified he told his defense counsel every day during the trial that he wanted to take the stand. His defense counsel assured him he would have the opportunity to do so, but never called him. Guled claimed he never told his defense counsel he did not want to testify. He further claimed he did not know he was not going to testify until after closing argument, when defense counsel informed him the trial was over and the court would not allow him to reopen his case to testify. He stated he only had an 11th grade education and had never been through a trial before. Consequently, he

removal, claiming he suffered from and feared persecution in Somalia because he was a member of the Madhiban clan, which was purportedly a despised minority clan. (*Id*. at pp. 876-877.) The immigration judge found Guled's claim was not credible in part because of evidence Guled was not, in fact, a member of the clan. (*Id.* at p. 877.) For this and other reasons, the immigration judge denied Guled's applications and ordered him removed. (*Id.* at pp. 877-878.) The Bureau of Immigration Appeals affirmed the immigration judge's decision and the Eighth Circuit Court of Appeals denied Guled's petition for review of the Bureau's decision, concluding, of pertinence here, substantial evidence supported the immigration judge's adverse credibility finding. (*Id.* at pp. 878-881.)

depended on his defense counsel to let him know when it was time for him to testify and to call him.

On cross-examination Guled acknowledged he knew the decision whether to testify belonged to him. He also acknowledged the court had asked him whether he wanted to testify and had allowed him to reopen his case so he could testify. However, he denied changing his mind and deciding not to take the stand after his last-minute witness testified. Rather, he claimed he kept waiting for defense counsel to call him. He further claimed he did not inform the court defense counsel was not letting him testify because he did know he could directly address the court.

The court denied the new trial motion. In reaching its decision, the court specifically found Guled had decided, in conjunction with his defense counsel, not to testify.[6]

B

Guled contends the court deprived him of his constitutional right to testify on his own behalf. The record belies this contention.

" ' "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." [Citation.] The defendant's "absolute right not to be called as a witness and not to testify" arises from the Fifth Amendment to the United States Constitution and article I,

---

6      In the "Summation" section of his brief, Guled states his "motion for new trial should have been granted for all the reasons contained herein." As the body of Guled's brief does not contain any arguments or authorities supporting this specific point, we treat the point as forfeited and decline to consider it. (*People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

section 15 of the California Constitution. [Citation.] Although tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel. [Citations.]' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1198.)

In this case, the record shows Guled knew he had a right to testify and knew the choice whether to exercise the right belonged solely to him. Defense counsel repeatedly acknowledged Guled's right and choice on the record in Guled's presence. Guled also acknowledged his right and choice on the record.

In addition, the court went to great lengths to accommodate Guled's right and choice. It gave him time during the trial to discuss the matter with defense counsel and it allowed him to reopen his case to testify, even though the trial was running long and it inconvenienced the People's rebuttal witness, the victim. Although defense counsel did not believe it advisable for Guled to testify, nothing in the record indicates defense counsel did anything to prevent Guled from testifying.

Moreover, while Guled testified at the hearing on his new trial motion that his desire to testify was unwavering, the record shows otherwise. Before he rested his case for the first time, Guled expressly stated he had decided not to testify. The events following this initial decision show Guled continued to grapple with the matter. They do not show Guled made a firm decision to testify or that his defense counsel obstructed his decision. At the hearing on the new trial motion, the court implicitly found Guled's testimony on this point lacked credibility. The finding is supported by substantial evidence and bolstered by the existence of good reasons for Guled to choose not testify. He had other witnesses to

13

support his alibi defense and his testimony was impeachable both with his prior bad acts and, if he testified about tribalism, with the immigration court's adverse credibility finding. Accordingly, we conclude Guled has not established the court deprived him of his right to testify.

C

Guled alternatively contends the court was required to obtain his express waiver of his right to testify because of known difficulties between him and his defense counsel and his lack of sophistication with criminal trial matters. We disagree.

A court has no duty to advise a defendant of the right to testify or seek an explicit waiver of the right from the defendant unless the court learns of an express conflict between the defendant and defense counsel about the matter. (*People v. Enraca* (2012) 53 Cal.4th 735, 762.) In this case, the record shows the court conducted two closed hearings at the outset of the trial in which Guled complained about his defense counsel, who was retained rather than appointed. Guled's complaints centered on his belief his defense counsel had not been communicating enough with him, had not prepared enough for trial, and was not following Guled's preferred defense strategy. Importantly, Guled never complained then or at any other time during the trial that defense counsel would not let him testify on his own behalf. In addition, while defense counsel indicated he intended to advise Guled not to testify, he never indicated he would not call or assist Guled if Guled chose to testify. His request to reopen Guled's case so Guled could testify demonstrates he was willing to facilitate Guled's choice notwithstanding any disagreement he might have had with it.

14

Guled's asserts, as he did at the hearing on his new trial motion, he did not know he could directly inform the court defense counsel was obstructing his desire to testify. The court implicitly found this assertion incredible and Guled's active participation in the two closed hearings at the outset of the trial belies it.

Moreover, before Guled rested his case the first time, the court inquired and Guled expressly stated he had decided not to testify. The fact Guled continued to grapple with his choice after making this statement did not demonstrate the existence of an express conflict requiring the court to inquire again. (See, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1332-1333).

D

Guled also alternatively contends defense counsel provided ineffective assistance by failing to call him as a witness because he could have solidified his alibi as well as testified about how tribal status and prejudices may have motivated the testimony of Ismail, Mire, and Hassan.[7] We conclude this contention lacks merit.

" 'The law governing defendant's claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " [Citations.] It is defendant's burden to

---

[7] In the "Summation" section of his brief, Guled additionally states his defense counsel provided ineffective assistance by failing to object to the admission of improper character evidence at various points in the trial. As the body of Guled's brief does not contain any arguments or authorities supporting this specific point, we treat the point as forfeited and decline to consider it. (*People v. Myles*, *supra*, 53 Cal.4th at p. 1222, fn. 14.)

demonstrate the inadequacy of trial counsel.  [Citation.]  [The California Supreme Court has] summarized defendant's burden as follows:  " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' "  [Citation.]  [¶]  Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  [Citation.]  Defendant's burden is difficult to carry on direct appeal, as we have observed:  " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' "  [Citation.]'  [Citation.]"  (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

In this case, the record amply demonstrates defense counsel had a rational tactical purpose for not calling Guled as a witness.  Because defense counsel had already presented alibi witnesses, the chief purpose for calling Guled would have been to provide a factual foundation for the cultural expert's testimony in support of a tribalism defense.  (See part III.A., *post*.)  On this point, Guled's testimony was both generally and specifically

16

impeachable.  It was generally impeachable with his prior bad acts of giving a peace officer a false name, lying to a peace officer, and falsely impersonating another.  It was specifically impeachable with an immigration judge's prior finding Guled's claim of being a member Madhiban was not credible.  (See fn. 5, *ante*.)  The impeachment not only could have undermined the tribal defense, but it also could have undermined the stronger alibi defense.  Thus, Guled has not established defense counsel's failure to call him as a witness was professionally unreasonable or that it is reasonably probable the trial result would have been different had defense counsel called him as a witness.

## II

*Suggestiveness of Photographic Lineup and Reliability of Pretrial Identifications*

Guled contends the photographic lineup was unduly suggestive and the resulting pretrial identifications were untrustworthy because Guled did not match the initial descriptions of the shooter and he was the only person in the lineup previously known to the witnesses.  Because Guled did not object to the admission of the lineup evidence below, he has forfeited this contention on appeal.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 989; *In re Michael L.* (1985) 39 Cal.3d 81, 87-88.)

Even if Guled had not forfeited this contention, we conclude it lacks merit. " ' [T]o determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the

17

witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.  [Citations.]' [Citation.]  If the answer to the first question is 'no,' because we find that the challenged procedure was not unduly suggestive, our inquiry into the due process claim ends. [Citation.]"  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256; see also *People v. Avila* (2009) 46 Cal.4th 680, 698 [to successfully challenge lineup evidence, a defendant must first establish that the lineup procedure was unduly suggestive, and then establish the resulting identification was unreliable under the totality of the circumstances].)

The defendant " 'has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." [Citation.] . . . [¶] . . . '[A]n identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." [Citation.]' [Citation.]"  (*People v. Johnson* (2010) 183 Cal.App.4th 253, 271-272.)

The photographic lineup presented to the witnesses in this case depict six Black males of similar age, complexion, and build.  All of the men have mustaches, goatees, and long hair styled close to their heads and away from their faces.  All of the men have their eyes opened and their mouths closed.  One of the men, not Guled, had a raised scar under his right eye.  Four of the men wore black T-shirts, one of the men wore a white T-shirt, and Guled wore a white or gray shirt underneath a black shirt or jacket.  Because of his

18

black jacket, Guled's photo tended to blend with, rather than stand out from, the photos of the four men wearing black T-shirts.

While the photos were taken in similar lighting, there are differences in the background colors and image size. Most notably, the head of the man wearing the white T-shirt is larger than the others and he was photographed against a pink background rather than a gray or blue background like the others. Such differences do not generally render a lineup impermissibly suggestive (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217) and, in this case, they tended to divert attention from Guled's photo.

Moreover, at the top of the lineup is an admonition, stating: "You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not under any obligation to identify anyone. It is just as important to free innocent persons from suspicion as it is to identify guilty persons. Do not be influenced by the fact that the persons in the photographs may have beards, mustaches, or long hair. Do not be influenced by the fact that some of the pictures may have different background color or lighting. Please do not discuss the case with other witnesses nor indicate in any way that you have or have not identified someone." The officer who presented the lineup testified he read the admonition to each witness before the witness made an identification. "Where photographs in a lineup are of males of the same ethnicity and 'generally of the same age, complexion, and build, and generally resembling each other,' and where the accused's 'photograph did not stand out, and the identification procedure was sufficiently neutral,' the lineup is not

19

impermissibly suggestive. [Citations.]" (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082.)

The fact Guled may have been the only person depicted in the lineup with whom Mire and Ismail were previously familiar does not alter our conclusion.[8] Guled has not cited nor have we located any authority holding prior familiarity with a depicted person renders a lineup unduly suggestive. In addition, it does not appear either man knew Guled well enough to avoid the need for a lineup. The evidence shows only that they had seen him around the San Diego Somali community with Jama and that Mire knew Guled's moniker. It also does not appear the officer who created the lineup knew of Mire and Ismail's prior familiarity with Guled. Even if the officer had known of the prior familiarity, his task remained the same: to create an array of people who generally resembled one another. Since he succeeded in this task, Guled has not established the pretrial identifications deprived him of due process of law.

III

*Exclusion of Cultural Expert's Testimony*

A

Before the prosecutor rested his case, defense counsel informed the court he intended to call a cultural expert who would "expand upon or refute [Clayton's] testimony relative to the clan structure and . . . testify that [Guled] is a member of what is charitably and lovingly referred to [as] an occupational clan, the Madhiban. And that people of the

---

8       Hassan had never seen Guled before.

higher clans, such as the Hawiye and the higher clans, can be ostracized from their clan for marrying someone or keeping company with someone from a marginalized clan such as the Madhiban."

The prosecutor objected to the expert's testimony as irrelevant since Clayton did not testify about tribalism. Defense counsel countered that Clayton had testified about the clans and Guled should be allowed to rebut the testimony.[9] The court did not decide the matter at that time, but revisited it just before defense counsel intended to call the expert.

The prosecutor again objected to the testimony as irrelevant. The prosecutor pointed out that Clayton testified about her experience with language barrier challenges and concerns San Diego Somali crime victims had about retaliation. She did not testify

---

9       As part of the foundation for Clayton's testimony, defense counsel wanted the prosecutor to elicit testimony from Clayton about her knowledge of Somali tribal matters, but the prosecutor declined. The court commented, "I don't blame you because the testimony I have heard from both Mr. Mire and Mr. Hassan." The court continued, "The young guys don't really care about tribes, don't know their tribes, don't care about their tribes. It's only the old people that care about tribes. So, so far, tribal affinity doesn't seem to be an issue. So the fact you're not going to go into it that's okay. That's your tactical decision."

On cross-examination, defense counsel asked Clayton about tribes and she explained she did not work directly with tribes. She also explained her "best guess" about elders passing along tribal information to young people was "[t]hat the elders are very traditional when it comes to tribal interaction but the younger kids don't really care about tribes."

Defense counsel later asked Clayton whether she had talked "to elders who expressed displeasure with [Jama] consorting with Guled?" Clayton responded that she had spoken with community members who were concerned for Jama's safety because of her association with Guled. Defense counsel asked if that was because Guled was associated with the Madhiban tribe. Clayton responded, "Tribes never came into it at all. It was his behaviors that the community was concerned for her safety." Defense counsel persisted, "Wasn't because he wasn't [a] member of the Hawiye?" Clayton remained firm, "Tribes never came [into] play. It was based on his actions."

21

about tribalism. He also pointed out there was no factual basis for the expert's testimony because there had been no evidence presented indicating tribal differences prompted rival tribe members to frame one another for crimes.

The prosecutor additionally questioned whether the expert possessed sufficient qualifications to testify about Somali tribalism. According to the expert's curriculum vitae, his expertise was in the history of slavery in West Africa, not tribal strife in East Africa. There was no indication the expert knew anything about tribal strife in East Africa, had published on the topic, or had any knowledge of interactions within the San Diego Somali community.

The court indicated that, while it was inclined to allow defense counsel to use an expert to present a tribalism defense, no evidence had yet been presented to support and make the defense relevant. Rather, the evidence presented to that point indicated younger Somalis were not concerned with or motivated by tribal affiliations.[10]

Defense counsel acknowledged the conundrum and indicated he would have to call Guled or an elder from the Somali community to provide the factual foundation for the expert's testimony. However, defense counsel did not do either and subsequently released the expert as witness.

---

[10] Hassan testified he had no tribal affiliation and did not believe in tribalism. Mire testified he did not know anything about tribes and neither he nor his friends were "into" tribes. He also testified he did not know Guled's tribal affiliation and was unsure of his own tribal affiliation or his parents' tribal affiliation.

B

Guled contends the court erred by failing to allow him to present expert testimony to show tribal animosity motivated witnesses to falsely identify him as the shooter. We review a trial court's determination whether an expert's testimony is admissible for abuse of discretion. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 84.) " '[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 430.) We discern no abuse of discretion in this case.

Although the court was inclined to allow Guled to use an expert to present a tribalism defense, there was no factual foundation for the defense at the point defense counsel sought to call the expert. None of the eyewitnesses gave any indication their tribal affiliations or Guled's tribal affiliation played any role in their identifications of him as the shooter. Rather, the evidence showed the eyewitnesses did not know Guled well and were uninterested in tribal matters.

In addition, Clayton did not profess to be an expert in nor did she testify about Somali tribal matters. Her testimony was limited to explaining certain challenges in police interactions with crime victims in the San Diego Somali community, including language barriers, lack of trust in people wearing uniforms, concerns about retaliation, and the desire to try to resolve problems within the community before contacting the police

department.[11] While she acknowledged knowing some of the major tribes represented in the Somali community, she testified knowledge of tribal interactions was not directly pertinent to her job responsibilities. She also testified, consistent with the eyewitnesses' testimony, that her "best guess" was younger Somalis were generally unconcerned about tribal matters.

Had he testified, Guled might have been able to provide a sufficient factual foundation for the expert's testimony; however, as we explained in part I.D., *ante*, defense counsel had good tactical reasons for not calling Guled as a witness. Not the least of these reasons was a prior finding by an immigration judge, upheld on appeal, that Guled's claim of being from the purportedly disfavored Madhiban tribe was not credible. (See fn. 5, *ante*.)

As a defendant does not have a right to present factually unfounded expert testimony (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1099 & fn. 10), Guled has not established the court abused its discretion in excluding the testimony of his expert. Given

---

[11]    Ismail testified that, when he was in the hospital, some Somali elders had approached him and his aunt attempting to resolve this matter informally within the San Diego Somali community. His aunt demurred on his behalf, indicating this matter should be resolved by the criminal justice system. The existence of this attempt at an informal resolution tends to undermine Guled's tribalism defense as it is inconsistent with his assertion the San Diego Somali community was trying to frame him because of his relationship with Jama.

this conclusion, we need not address Guled's assertion defense counsel provided ineffective assistance by failing to call the expert.[12]

IV

*Insufficient Evidence of Requisite Mental State*

Finally, Guled contends there is insufficient evidence to support his attempted murder conviction because there is insufficient evidence he intended to kill Ismail. In deciding claims of insufficient evidence in criminal cases, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there

---

[12] We also need not address this point because Guled did not provide any argument or authority supporting it. (*People v. Myles*, *supra*, 53 Cal.4th at p. 1222, fn. 14.)

25

sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Here, the evidence shows that after Ismail and Mire slighted Guled, Guled retrieved a gun from the back of his car. Then, while Jama drove slowly by Ismail and Mire, Guled fired at least three shots at them, striking Ismail with one of the shots. "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*Id.* at p. 1218.) That Guled may not have known Ismail, may not have had a motive to kill him, and may not have been aiming at him does not preclude a valid attempted murder conviction. Motive is not an element of the crime of attempted murder nor does the crime necessarily require a specific target. (*Ibid*.) Accordingly, we conclude Guled has not established there was insufficient evidence to support his attempted murder conviction.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

McDONALD, J.