Filed 1/24/25  P. v. Lobato CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESSE LOBATO,<br><br>    Defendant and Appellant. | D083304<br><br><br>(Super. Ct. No. FWV18002049) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Knish, Judge.  Affirmed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

Jesse Lobato appeals from a judgment against him after a jury convicted him of kidnapping for carjacking, carjacking, criminal threats, and being a felon in possession of a firearm and ammunition.  He raises issues

regarding the admissibility of the photo lineups in which the victims identified him as the perpetrator of two separate carjackings, the joinder of the crimes in a single trial, and ineffective assistance of counsel.  Finding no reversible error, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *August 18, 2017 Carjacking Involving R.C.Z.*

Around 2:00 or 3:00 a.m. on August 18, 2017, R.C.Z. was parked in his driveway in Colton after driving home from work.  A man with a t-shirt covering his face tapped on his window, pointed what appeared to be a gun inside a sock at R.C.Z.'s head, and said, "Don't do anything stupid or else I'm gonna blast your ear."  R.C.Z. later identified the man as Lobato.  Lobato got into the passenger seat.  He told R.C.Z. he had just committed three homicides and needed a ride.

Lobato ordered R.C.Z. to drive and eventually directed him to an isolated dirt road.  After telling R.C.Z. to pull over, he demanded that R.C.Z. get out of the car and hand over his phone, keys, wallet, and money.  As Lobato put the money in his pocket, R.C.Z., who was trained in martial arts, punched him in the head, put him in a headlock, took him to the ground, grabbed the gun from his pants, and threw it to the side.  R.C.Z. choked Lobato until he was unconscious.

While Lobato was passed out on the ground, R.C.Z. answered a phone call from his mother.  He told her he had been carjacked and needed to call the police.  Lobato regained consciousness while R.C.Z. was on the phone.  R.C.Z. lunged at him and Lobato ran away.  R.C.Z. got a good look at Lobato's face while Lobato was passed out because the t-shirt had fallen off during the struggle.

2

R.C.Z. called the police. At the scene, the police recovered the t-shirt, a pair of gloves, and a toy gun inside a sock. R.C.Z. suffered cuts and scrapes to his arms and legs from rolling around on the ground with Lobato.

In the 911 call, R.C.Z. described the man as Hispanic with short, black hair, about 5'7" to 5'8" tall, weighing about 170 to 180 pounds. R.C.Z. told the officer at the scene that the man was a Hispanic male in his 20's, slender build, 5'8" tall, weighing about 150 to 170 pounds, with a moustache, short messy hair, and a tattoo in cursive on his neck.

Lobato is a Hispanic male. He was nearly 27 years old at the time of the carjacking, 5'8" tall, and weighed 180 pounds according to law enforcement records. He had tattoos on his upper body and arms, including tattoos in cursive on his upper chest, upper back, and the back of his neck. When Lobato was identified as a suspect in June 2018, he appeared to one officer to be about 180 pounds and to another to be roughly 200 plus pounds. Lobato had a buzz cut at the time, as he did in a booking photo from a prior arrest in September 2017.

The crime lab tested samples from the glove and t-shirt for DNA. The glove did not have enough DNA to analyze. As for the t-shirt, Lobato's DNA profile matched a single-source male DNA sample taken from one swab, and it matched one of four DNA contributors to another swab taken from the shirt collar. Although the defense DNA expert criticized aspects of the DNA evidence, he agreed that Lobato's DNA was on these two swabs from the t-shirt.

About a month after the carjacking, before receiving the DNA results, the police showed R.C.Z. a six-pack photo lineup without a photo of Lobato. R.C.Z. did not identify anyone in this lineup.

After receiving the DNA results in June 2018, Officer Valencia showed R.C.Z. another six-pack photo lineup with Lobato's photo in it. Before showing the lineup to R.C.Z., Officer Valencia read him a standard photo lineup admonishment, including that the photos "may or not contain a picture" of the perpetrator, that "hairstyles, beards and moustaches may easily be changed," and that "[i]t is just as important to free innocent persons from suspicion as to identify guilty parties." R.C.Z. circled Lobato's photo and identified him as the perpetrator of the carjacking. According to R.C.Z., he was certain of his identification.

R.C.Z. also identified Lobato as the perpetrator at trial. At trial, R.C.Z. described the perpetrator as "pretty stocky, like a 180, 190 pounder-ish." According to R.C.Z., he thought the word "slender" meant big and bulky when he used it to describe the perpetrator to the responding officer.

B.    *October 23, 2017 and June 4, 2018 Incidents Involving Vehicle Stolen from D.T.*

On October 23, 2017, about two months after the R.C.Z. carjacking, D.T. left his girlfriend's Chevrolet Impala running outside a liquor store in San Bernardino while he went inside to make a purchase. Before entering the store, he saw a white Kia in the parking lot with three people inside it. When D.T. came out a few minutes later, he saw his girlfriend's Impala being driven out of the parking lot. He asked the liquor store clerk to call the police, then ran to his apartment nearby, where he lived with his girlfriend and children. His girlfriend's mother called the police.

When the police responded, D.T. told them that when he went into the liquor store, he saw a stocky Hispanic man get out of the Kia. As D.T. exited the liquor store, the man pointed a gun at him, got into the Impala, and drove off. D.T. described the man as being in his mid-thirties, 5'11", about 200

4

pounds, with long black hair down to his shoulders and tattoos on his forearms.

Over seven months later, on June 4, 2018, the Upland police stopped Lobato for a traffic violation while he was driving the stolen Impala. Lobato initially gave a false name and birthdate. He had ammunition in his pocket, and the police found a gun, a glass pipe, and brass knuckles in the car. The parties stipulated that Lobato had previously been convicted of a felony.

The next day, a detective went to D.T.'s home and showed him a six-pack photo lineup that included Lobato's photo. Before showing him the lineup, the detective gave D.T. a standard admonishment similar to the one given to R.C.Z. D.T. picked out the photo of Lobato, signed the lineup sheet, and wrote on the bottom: "This was the guy that had the gun and took off in my girlfriend's car."

At trial, D.T. recanted his October 23, 2017 statement to the police and testified that he did not see anyone get into his girlfriend's car and did not see anyone with a gun. According to D.T.'s trial testimony, all he saw when he came out of the liquor store was his girlfriend's car driving away. D.T. also testified that someone told him to pick Lobato's photo in the lineup.

The detective who conducted the lineup denied telling D.T. whom to pick. He was the only law enforcement officer present with D.T. at the time.

About one month before D.T.'s trial testimony, D.T. participated in a recorded interview in the D.A.'s office. During that meeting, the prosecutor played the audio of a body camera recording of D.T.'s October 23, 2017 conversation with the police and asked D.T. to correct anything that was inaccurate. D.T. listened to the recording and confirmed that his prior statements were correct, except that he could not remember if he made "eye to eye" contact with the Hispanic man with the gun. The prosecutor also

5

showed D.T. the photo lineup in which he had picked out Lobato. D.T. responded, "I don't remember this, I ain't going to lie to you, but, that's my signature." He did not say that someone had told him whom to pick in the lineup. The only question D.T. had for the prosecutor was, "Do I have to go on the stand?" When the prosecutor responded in the affirmative, D.T. said, "This is what I have to do to not be criminalized, I'll just do what I have to do."

D.T.'s girlfriend's mother testified that when D.T. returned home from the liquor store on October 23, 2017, he reported that a "Mexican guy" had pulled out a gun and taken the car.

C. *Trial Court Proceedings*

In a third amended information, Lobato was charged in count one with committing carjacking against D.T. on October 23, 2017 (Pen. Code,[1] § 215, subd. (a)). Counts two and three alleged that on June 4, 2018, Lobato was a felon in possession of a firearm (§ 29800, subd. (a)) and unlawfully possessed ammunition (§ 30305, subd. (a)). Counts four through six alleged that on August 18, 2017, Lobato committed kidnapping for carjacking (§ 209.5, subd. (a)), carjacking (§ 215, subd. (a)), and criminal threats (§ 422) against R.C.Z. The information further alleged that Lobato had suffered two strike and serious felony priors (§§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)).

In a jury trial, Lobato's counsel conceded his guilt of counts two and three in closing argument. The jury deadlocked 8-4 for an acquittal on count one (the carjacking of D.T.). The court declared a mistrial as to count one, which was later dismissed. The jury found Lobato guilty as charged on counts two through six. In a bifurcated trial on priors, the court found the serious felony and strike priors to be true.

---

[1] All further statutory references are to the Penal Code.

6

The court sentenced Lobato to an indeterminate term of 25 years to life and a determinate term of five years four months.

## DISCUSSION

### I

Lobato first contends that the admission of both photo identification lineups violated due process because they were unduly suggestive. In the alternative, if the issue was forfeited by his counsel's failure to object at trial, Lobato argues he received ineffective assistance of counsel.

We agree with the People that the issue is forfeited because there was no defense objection to the photo lineups at trial. Lobato was initially represented by the Public Defender's office, which filed a motion to exclude D.T.'s photo identification in 2018. However, the trial court deferred a ruling on this motion until the time of trial. By the time of trial in 2022, Lobato had retained new counsel to represent him and there was a newly assigned trial judge. Lobato's retained counsel never renewed the Public Defender's motion or requested a ruling on it and did not object to the admission of the photo lineups at trial. Accordingly, the issue is forfeited. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [failure to object forfeited claim that photo line-up was suggestive]; *In re Michael L.* (1985) 39 Cal.3d 81, 87–88 [same].)

Lobato also cannot prevail on his claim of ineffective assistance of counsel for failure to object. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211 (*Scott*); *Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*).)

Lobato cannot prevail on either of these prongs because the appellate record does not support his claim that the admission of the photo lineups violated due process. In evaluating whether identification evidence violates due process, courts consider two factors (1) whether the identification was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 768.)

We focus on the first of these factors. Under the case law, a due process violation occurs "only if the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*People v. Wilson* (2021) 11 Cal.5th 259, 283, internal quotation marks omitted.) "In evaluating the suggestiveness of a photo array, we consider whether anything caused defendant to stand out from the others in a way that would suggest the witness should select him." (*Id.* at p. 284, internal quotation marks omitted.)

Lobato has failed to point to anything that caused him to stand out from the others in either of the two photo lineups.[2] The photo lineup viewed by R.C.Z. was generated by a system that was specifically designed to find others with physical traits similar to the suspect's, including height, weight, hair color, and eye color. The photo lineup viewed by D.T. was also designed to include others who looked similar to Lobato. We have independently inspected both photo lineups, and we see nothing that made Lobato's photo stand out in either one. Moreover, before viewing the photo lineups, R.C.Z. and D.T. each received standard admonishments that the photos did not

---

[2] Appellate counsel for Lobato requested transmission of some of the trial exhibits to this court, but not the photo lineups. We have independently requested transmission of the photo lineups (Exhibits 12 and 14) and received them from the superior court.

8

necessarily include the perpetrator, and that it was just as important to free innocent persons from suspicion as to identify those who are guilty.

Lobato argues that the lineups were unduly suggestive primarily because the detectives did not follow the blinded procedures required by section 859.7, which became operative on January 1, 2020. (§ 859.7, subd. (e).) Among other things, this statute now requires the use of "blind" or "blinded" administration for photo or live lineups. (*Id.*, subd. (a)(2).) "Blind administration" means the administrator of the identification procedure does not know the identity of the suspect, and "blinded administration" means the administrator may know who the suspect is but does not know where the suspect has been placed or positioned in the lineup. (*Id.*, subds. (c)(1) & (2).)

This statute was not yet in effect at the time of the 2018 photo lineups at issue here. As noted, the Legislature made clear that the statute did not "become operative" until January 1, 2020. (§ 859.7, subd. (e).) Lobato does not argue that the statute applies retroactively to lineups occurring before its operative date. Thus, the only conceivable basis for his ineffective assistance claim is that defense counsel should have objected to the lineups on due process grounds. But the new statutory mandates of section 859.7 are not required as a matter of due process. Although the Legislature enacted section 859.7 "to enhance the reliability of eyewitness identifications," the relevant due process inquiry "is not whether a practice might enhance reliability, but whether its omission is indicative of a procedure that is unduly suggestive." (*People v. Wilson* (2024) 16 Cal.5th 874, 993.) As our Supreme Court has made clear, due process does not independently require the use of blinded procedures for photo lineups. (*Ibid.* [lineup not unduly suggestive "simply because the lineup was not blind"]; *People v. Lucas* (2014) 60 Cal.4th 153, 237 [same], disapproved on other grounds in *People v. Romero*

9

*and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) Defense counsel therefore had no valid legal basis for objecting to the 2018 lineups on this ground.

Lobato also argues that the D.T. lineup was unduly suggestive because D.T. testified at trial that the detective directed him to pick Lobato out of the lineup. But the detective denied doing so, and no other evidence supported D.T.'s trial testimony on this point. Even if the issue had been raised below, there is no reasonable probability the trial court would have resolved this conflict in D.T.'s favor or excluded the photo lineup based on his trial testimony because (1) D.T.'s trial testimony conflicted with all his prior statements to law enforcement and his own family members, including a very recent recorded statement to the prosecutor; (2) until he took the stand, D.T. had never before claimed that someone told him to pick Lobato in the lineup; and (3) D.T. was an uncooperative witness who failed to appear and had been arrested and taken into custody on a bench warrant for an earlier court date and who admitted he did not want to testify and feared being treated as a "snitch." Even defense counsel had to acknowledge in closing argument that D.T.'s trial testimony was "nonsense." Defense counsel told the jury: "[D.T.] gets . . . on the stand and says what he says, and, '*They made me point to this,*' and '*they made me do this*' and . . . whatever he was saying it's -- it's all -- *it was nonsense what he was saying.* It's he had no respect for the courtroom. He had no respect for our time." (Italics added.) Thus, there is no reasonable probability the trial court would have excluded the photo lineup as unduly suggestive based on D.T.'s trial testimony.

As for the R.C.Z. lineup, Lobato argues it was unduly suggestive because it was conducted in response to the DNA hit on the t-shirt found at the scene and "there were problems with this DNA identification." We fail to see how any purported problems with the DNA evidence could have made the

10

photo lineup unduly suggestive. As we have noted, even the defense expert conceded that Lobato's DNA was on two swabs taken from the t-shirt at the scene that was used by the perpetrator to cover his face. To the extent Lobato is suggesting that the detective who conducted the lineup may have unconsciously signaled to R.C.Z. that Lobato was the perpetrator based on his knowledge of the DNA evidence, this is pure speculation not supported by anything in the record. On this record, Lobato cannot meet his "burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just speculation.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

Because the photo lineups were not unduly suggestive, Lobato's trial counsel did not render ineffective assistance by failing to challenge their admissibility on due process grounds. A defense attorney does not render ineffective assistance by failing to make unmeritorious motions or objections. (*People v. Hines* (1997) 15 Cal.4th 997, 1047; *People v. Price* (1991) 1 Cal.4th 324, 387.)

II

Lobato next argues that the trial court abused its discretion by granting the prosecution's motion for joinder of the carjacking and kidnapping case involving R.C.Z. with the other charges involving the carjacking of D.T. and Lobato's arrest in the stolen vehicle with a gun and ammunition. We find no abuse of discretion and no due process violation.

A. *Additional Background*

The People originally charged the August 18, 2017 offenses against R.C.Z. in a separate case from the other offenses committed on October 23, 2017 and June 4, 2018. In August 2018, the People filed a motion for joinder of the two cases under section 954. The People's motion briefly summarized

11

the facts of each offense, including the DNA evidence and eyewitness identification as to the R.C.Z. carjacking and Lobato's arrest in the stolen vehicle and the eyewitness identification in the D.T. carjacking. The People argued that none of the charges was unduly inflammatory in relation to the others, and the evidence in each case was strong. Lobato's written opposition did not argue that either case was weaker or more inflammatory than the other. Instead, Lobato argued that the cumulative effect of trying both carjacking cases together would inflame the jury and cause it to believe that he probably committed one or both.

The trial court granted the motion for joinder. The court found that there were identical charges in the two cases, they were committed only a couple months apart, and there was a statutory basis for joinder. The court questioned whether the evidence would be cross-admissible in separate trials, but nevertheless concluded that no substantial or undue prejudice would result from joinder. The court observed that there was "similar corroboration" for both crimes in that there was "a photo ID made by the victim in each case" and the photo identification was corroborated in one case "through the DNA hit and in the other case [by] the fact that the defendant is in the actual car that was alleged to have been stolen once before at the time of his arrest." The court therefore concluded there was no risk of a weak case being bolstered by a strong one. The court also concluded that the "other policy considerations" underlying section 954 favored joinder.

At the beginning of trial, defense counsel made an oral motion to sever the counts before the newly assigned trial judge. Defense counsel conceded that the two carjackings were the same class of crimes, but argued there was a danger of "bootstrapping" because one was stronger than the other.

Defense counsel did not identify which he believed was the stronger charge or why.

In its ruling, after reviewing the motion to consolidate, the court questioned whether the evidence would be cross-admissible in separate trials, but denied the motion for severance after concluding that the statutory requirements for joinder were met, none of the charges was unusually likely to inflame the jury, a weak case had not been joined with a strong case, and the joinder did not render it a capital case.

As noted, the jury ultimately deadlocked 8-4 for acquittal on the carjacking charge involving D.T. but convicted Lobato of all the other charges.

B. *Analysis*

Section 954 authorizes the joinder of two or more different offenses that are "connected together in their commission" or that are "of the same class of crimes or offenses." Joinder of charges is favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials. (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*); *People v. Merriman* (2014) 60 Cal.4th 1, 37.) Thus, joinder " 'is the course of action preferred by the law,' " but "a trial court [nonetheless] has discretion to sever properly joined charges in the interest of justice and for good cause." (*Simon*, at p. 122.)

Lobato does not dispute that the charged crimes met the statutory requirements for joinder because they were of the same class or connected together in their commission. (§ 954.) We must therefore determine whether the trial court nevertheless abused its discretion by allowing their joinder and refusing to sever them. (*People v. Vargas* (2020) 9 Cal.5th 793, 817 (*Vargas*).) "Where, as here, the statutory requirements for joinder are met, a

13

defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.] A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial." (*Simon, supra*, 1 Cal.5th at pp. 122–123, fn. omitted.)

A reviewing court considers four factors to determine whether the trial court abused its discretion. First, "we consider 'whether evidence of the crimes to be jointly tried is cross-admissible.' [Citation.] Second, we address whether the charges are especially inflammatory. Third, we consider whether a weak case has been joined to a strong one 'so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges.' [Citation.] Finally, we consider whether joinder renders the case capital when it would not otherwise have been." (*Vargas, supra*, 9 Cal.5th at p. 817.)

We examine each of these four factors in turn. As to the first, the trial court expressed doubt that the evidence would be cross-admissible in separate trials. We agree and will therefore assume no cross-admissibility. Although this factor counts against joinder, it is not dispositive. (§ 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"]; see *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221–1222 ["Our decisions also make clear that even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance. We repeatedly have found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges*

14

*would not have been cross-admissible in separate trials.*"]; see also *People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).)

Second, we conclude that neither set of charges was particularly inflammatory. Both cases involved a carjacking in which the perpetrator pointed what appeared to be a gun at the victim. Neither victim suffered any significant injuries. Each incident featured some unique facts, but neither was more inflammatory than the other when considering the totality of the evidence. Although the perpetrator actually kidnapped R.C.Z. but not D.T., the perpetrator got away with D.T.'s vehicle but not R.C.Z.'s, and he only used a toy gun in the R.C.Z. carjacking but he was apprehended with a real gun and ammunition when stopped by the police driving D.T.'s stolen vehicle. And even though R.C.Z. was kidnapped, he was ultimately able to overpower the perpetrator and choke him into unconsciousness. Overall, we agree with the trial court's ruling that neither set of charges was particularly inflammatory in relation to the other.

Third, based on the facts known to the trial court at the time of its pretrial rulings on the joinder and severance motions (*Soper, supra*, 45 Cal.4th at pp. 774 & 776, fn. 10), we also agree that neither set of crimes was particularly weak in comparison to the other. As the court noted in its ruling on the joinder motion, each of the carjacking victims identified Lobato in a photo lineup, and one identification was corroborated by DNA evidence whereas the other was corroborated by Lobato's arrest in the stolen vehicle. The court knew little else about the cases when it made these pretrial rulings, and it had no evidentiary basis to conclude that one was weak and the other was strong.

As to the final factor, the joinder of charges did not turn an otherwise noncapital case into a capital case. (*Soper, supra*, 45 Cal.4th at p. 780.) For

15

all these reasons, we conclude Lobato did not make a clear showing of prejudice resulting from the joinder, and the trial court did not abuse its discretion in granting the prosecution's motion for joinder and denying the defense motion for severance.

Even if the trial court's pretrial rulings were not an abuse of discretion, however, we must still consider whether the joinder ultimately rendered the trial fundamentally unfair. Specifically, "we must . . . determine 'whether events *after* the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' " (*Simon, supra*, 1 Cal.5th at p. 129.) "In determining whether joinder resulted in gross unfairness, we have observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Id.* at pp. 129–130; see also *People v. Stitely* (2005) 35 Cal.4th 514, 531 ["A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process."].)

For multiple reasons, we conclude that the joinder did not result in any gross unfairness. The charges on which the jury convicted Lobato were either uncontested or "were supported by strong evidence warranting conviction had the incidents been tried separately." (*Simon, supra*, 1 Cal.5th at p. 130 [finding joinder did not result in gross unfairness in part for this reason].) Lobato's counsel in closing argument admitted his guilt of the June 4, 2018 felon in possession counts (counts two and three) and there was strong evidence of the R.C.Z. charges (counts four through six). R.C.Z.'s initial description of the perpetrator closely matched Lobato's race, height, weight, hair length, hair color, and cursive tattoos; R.C.Z. had a good opportunity to observe Lobato's uncovered face after choking him unconscious; R.C.Z. picked

16

Lobato out of a photo lineup after picking nobody in an earlier photo lineup that did not include Lobato; and even Lobato's DNA expert agreed that his DNA was on two swabs taken from the t-shirt the perpetrator used to cover his face.

"Appellate courts have [also] found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Soper, supra,* 45 Cal.4th at p. 784.) Here, the evidence underlying each set of charges was relatively simple and distinct.

The totality of the record further suggests that the jury did not aggregate the evidence of the separate counts. The prosecutor did not argue or suggest to the jury that it should consider evidence of one set of crimes in determining Lobato's guilt on the others. On the contrary, she argued each set of crimes separately based on the distinct evidence pertaining to each. Contrary to Lobato's contention, we do not believe the prosecutor's argument that the jury should focus on the totality of the evidence rather than isolated facts amounted to a suggestion to aggregate the evidence of the separate charges.

The jury's verdict itself establishes that the "jury was capable of, and did, differentiate among [the differing] crimes." (*People v. Jones* (2013) 57 Cal.4th 899, 927.) The jury hung 8-4 for acquittal on the D.T. carjacking charge (count one) but convicted Lobato on the R.C.Z. carjacking, kidnapping, and criminal threats charges. "That the jury was able to consider each case on its individual merits is shown by its failure to reach a unanimous verdict on [the D.T. carjacking count]." (*Ibid.*) As Lobato argues, the D.T. carjacking turned out to be the weaker of the two at trial as a result of D.T.'s recantation on the stand. Yet the jury's verdict establishes that it was not swayed to

17

convict Lobato on this weaker count based on his guilt of the R.C.Z. carjacking.

Finally, the jury's note reporting a deadlock on the D.T. carjacking count further indicates that the jurors kept the evidence of each carjacking separate and considered them separately. The jury's note specified the reasons why some jurors were voting not guilty and others guilty on the D.T. carjacking count. Under "not guilty," the note listed the following reasons with the last one crossed out: (1) "the credibility of the victim" (D.T.); (2) "the credibility of the mother-in-law"; and (3) "~~the police never looked at the liquor store tape~~[.]" Under "guilty," the note listed the following three reasons: (1) "found defendant in the same car that was car jacked"; (2) "chosing [*sic*] the defendant in the line up"; and (3) "witness's story was consistant [*sic*] up until he had to identify the defendant in court." Significantly, the jury's list of reasons for and against a guilty verdict on the D.T. carjacking mentioned nothing about Lobato's guilt of the separate R.C.Z. carjacking or the evidence of the R.C.Z. carjacking. And if the jurors were not considering evidence of the R.C.Z. carjacking in deciding Lobato's guilt of the weaker D.T. carjacking, it is not reasonably probable they did the converse.

We acknowledge that the trial court did not specifically instruct the jury to consider each count separately. (CALCRIM No. 3515.) But a trial court is not required to give this instruction sua sponte. (*People v. Beagle* (1972) 6 Cal.3d 441, 456, overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190–1191.) Even without this instruction, our review of the record persuades us that the jury did in fact consider each count separately.

Considering the proceedings in their entirety, we therefore conclude there is no reasonable probability the joinder unfairly tainted the jury's

18

verdicts on the counts of conviction. The joinder did not result in a grossly unfair trial.

Finally, Lobato argues that his attorney provided ineffective assistance of counsel by failing to request that the court instruct the jury with CALCRIM No. 3515, which provides in relevant part: "Each of the counts charged in this case is a separate crime . . . . You must consider each count separately and return a special verdict for each one . . . ."

We are not persuaded. Lobato cannot establish either deficient performance or prejudice under the *Strickland* standard. (*Strickland, supra*, 466 U.S. at pp. 687–688.) As to deficient performance, the appellate record is silent as to why defense counsel did not request CALCRIM No. 3515. It is "particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*Scott, supra*, 15 Cal.4th at p. 1212; see also *People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [reviewing court will find ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission" (internal quotation marks omitted)]; *People v. Mayfield* (1993) 5 Cal.4th 142, 188 ["tactical choices presented . . . on a silent record . . . are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them"].)

On this record, we cannot conclude there is no rational explanation for defense counsel's failure to request CALCRIM No. 3515. Defense counsel's

primary argument as to both cases was that law enforcement botched the investigations and jumped to a premature conclusion that Lobato was the perpetrator of both carjackings. Thus, defense counsel may have wanted the jury to consider the cumulative deficiencies in the investigations of both cases in deciding Lobato's guilt on either one. Defense counsel may also have believed that the perceived weakness of the D.T. charge could negatively affect the jury's perception of the other charges as well. These would have been rational tactical reasons not to request an instruction that each count must be considered separately. Lobato therefore cannot establish deficient performance based on the appellate record.

Lobato also cannot establish prejudice under the *Strickland* standard. As we have explained, the record indicates that the jury did consider each count separately even though it was not expressly instructed to do so. Moreover, Lobato's counsel admitted his guilt of the felon in possession counts and there was strong evidence of the R.C.Z. carjacking, kidnapping, and criminal threats counts. Thus, there is no reasonable probability the result would have been more favorable to Lobato if the trial court had given CALCRIM No. 3515.

We therefore conclude that Lobato has not established ineffective assistance of counsel based on his attorney's failure to request CALCRIM No. 3515.

## DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.